**No. 20-56172**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THE GEO GROUP, INC.,

*Plaintiff-Appellant*,

v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California;

and

XAVIER BECERRA, in his official capacity as Attorney General of the State of California,

*Defendants-Appellees*.

---

Appeal from United States District Court
for the Southern District of California
Civil Case No. 3:19-cv-02491-JLS (WVG)
(Honorable Janis L. Sammartino)

---

**OPENING BRIEF OF
APPELLANT THE GEO GROUP, INC.**

---

December 22, 2020 (counsel listed on reverse)

Michael B. McClellan
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA 92660
(949) 854-7000
Michael.McClellan@ndlf.com

Michael W. Battin
NAVIGATO & BATTIN, LLP
755 West A Street, Suite 150
San Diego, CA 92101
(619) 233-5365
mike@navbat.com

Charles J. Cooper
Michael W. Kirk
Steven J. Lindsay
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com

*Attorneys for Plaintiff-Appellant The GEO Group, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant The GEO Group, Inc. ("GEO") states that it is a nongovernmental corporate party organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. GEO has no parent corporation. The Vanguard Group, Inc., and BlackRock Fund Advisors are publicly traded corporations that each own 10 percent or more of GEO's stock.

Dated: December 22, 2020

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiff-Appellant*
*The GEO Group, Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 4

STATUTORY ADDENDUM STATEMENT .......... 5

STATEMENT OF THE CASE .......... 5

I. Factual Background .......... 5

A. Federal Immigration Detention Policy .......... 5

B. GEO's ICE Detention Facilities In California .......... 6

C. California's Early Efforts To Obstruct Federal Immigration Policy .......... 7

D. The Enactment Of AB-32 .......... 9

II. Prior Proceedings .......... 12

SUMMARY OF ARGUMENT .......... 13

STANDARD OF REVIEW .......... 17

ARGUMENT ........................................................................................ 18

I. AB-32 Is Unconstitutional As Applied to GEO's ICE Facilities Because It Violates the Intergovernmental-Immunity Doctrine. ................................ 19

A. AB-32 Directly Regulates the Federal Government's Immigration Detention Operations. ........................................................................ 20

1. The legal-incidence test does not apply in regulatory-immunity cases. ........................................................................ 24

2. The district court clearly erred by concluding that the legal incidence of AB-32 fell on GEO alone. ................................ 30

3. GEO's ICE facilities are "federal instrumentalities." ............... 33

B. AB-32 Unlawfully Discriminates Against the Federal Government. . 35

II. AB-32 Is Preempted by Federal Immigration Law. ..................................... 43

A. The Presumption Against Preemption Does Not Apply. .................... 44

B. AB-32 Clearly and Manifestly Conflicts with Federal Immigration Law. ........................................................................ 49

III. In the Alternative, the State May Not Enforce AB-32 Against GEO's ICE Facilities Before 2034 Under AB-32's Temporary Safe Harbor. .......... 57

CONCLUSION ........................................................................................ 59

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases** **Page**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166 (9th Cir. 2018) ........ 18

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) ........ 45

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) ........ 18

*Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013) ........ 4

*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) ........ 49

*Arizona v. United States*, 567 U.S. 387 (2012) ........ 45, 50

*Arizona v. California*, 283 U.S. 423 (1931) ........ 21

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir. 1998) ........ 59

*Barker v. Kansas*, 503 U.S. 594 (1992) ........ 42

*Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996) ........ 21

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) ........ 14, 20, 21, 23, 28, 30, 32, 33, 36

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) ........ 46, 47

*Brown v. Plata*, 563 U.S. 493 (2011) ........ 9

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ........ 47, 48, 52

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ........ 45, 47

*Clark v. Martinez*, 543 U.S. 371 (2005) ........ 50

*Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674 (9th Cir. 2004) ........ 25, 30

*Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. & N.D. Cal. 2013) ........ 9

*Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434 (9th Cir. 1986) ........ 51

*Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078 (9th Cir. 2011) ........ 24, 25

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ........ 52

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ....................51, 52

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)....................36, 42, 43

*Dawson v. Steager*, 139 S. Ct. 698 (2019)....................36, 37, 38, 41, 42

*Demore v. Kim*, 538 U.S. 510 (2003) ....................45

*Dep't of Emp. v. United States*, 385 U.S. 355 (1966)....................33

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ....................43

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
314 U.S. 95 (1941)....................33, 34, 35

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)....................54

*Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991) ....................56

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)....................52

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ....................22, 29

*Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020) ....................18

*Hancock v. Train*, 426 U.S. 167 (1976)....................14, 20, 22, 27, 28

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)....................45

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ....................46

*James v. Dravo Contracting Co.*, 302 U.S. 134 (1937)....................32

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ....................5

*Johnson v. Maryland*, 254 U.S. 51 (1920)....................14, 28

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ....................22, 29, 56

*Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982)....................33, 35

*Logue v. United States*, 412 U.S. 521 (1973) ....................34

*Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018)....................54

*Mayo v. United States*, 319 U.S. 441 (1943) ....................20, 21

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ....................1, 2, 19, 20, 35

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................44, 45

*Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019) ....................44

*Meredith v. Oregon*, 321 F.3d 807 (9th Cir. 2003)....................4

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ....................51

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ....................59

*Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199 (9th Cir. 2002) ....................47

*North Dakota v. United States*,
495 U.S. 423 (1990).................... 13, 14, 20, 25, 26, 35, 36, 43

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989)....................43

*Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824)....................21

*Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998) ....................33

*Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940) ....................46

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376 (1960) ....................36, 42

*Preiser v. Rodriguez*, 411 U.S. 475 (1973)....................33

*Pub. Utils. Comm'n of Cal. v. United States*,
355 U.S. 534 (1958)....................14, 26, 27, 29

*Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204 (4th Cir. 2019) ....................50

*Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020)....................17

*Ry. Mail Ass'n v. Corsi*, 326 U.S. 88 (1945) ....................21

*Savage v. Jones*, 225 U.S. 501 (1912) ....................43, 44

*Smith v. Kan. City Title & Tr. Co.*, 255 U.S. 180 (1921) ....................33

*South Carolina v. Baker*, 485 U.S. 505 (1988)....................35

*Sperry v. Florida*, 373 U.S. 379 (1963) ....................56

*Student Loan Servicing All. v. District of Columbia*,
351 F. Supp. 3d 26 (D.D.C. 2018)....................56

*United States ex rel. Adams v. Aurora Loan Servs., Inc.*,
813 F.3d 1259 (9th Cir. 2016) ....................34

*United States v. Boyd*, 378 U.S. 39 (1964) ....................34

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .................... 23, 24, 29, 36, 41, 43, 48, 49

*United States v. California*,
No. 2:18-CV-721-WBS-DB, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ......32

*United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010) ....................29

*United States v. City of Manassas*, 830 F.2d 530 (4th Cir. 1987) ....................38, 42

*United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir. 1981) ............................54
*United States v. City of St. Paul*, 258 F.3d 750 (8th Cir. 2001) ..............................22
*United States v. Fresno County*, 429 U.S. 452 (1977) ..........................................24
*United States v. Locke*, 529 U.S. 89 (2000)...........................................................45
*United States v. Michigan*, 851 F.2d 803 (6th Cir. 1988).......................................33
*United States v. New Mexico*, 455 U.S. 720 (1982) ..............................................25
*United States v. Nye County*, 178 F.3d 1080 (9th Cir. 1999) ..................................40
*United States v. Tingey*, 30 U.S. (5 Pet.) 115 (1831)..............................................46
*United States v. Virginia*, 139 F.3d 984 (4th Cir. 1998)...................................33, 56
*Washington v. United States*, 460 U.S. 536 (1983) ................................................38
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................................18
*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ..............................59

**<u>Constitution and Statutes</u>**

U.S. CONST. art. VI, cl. 2 ...........................................................................................19
6 U.S.C.
§ 112(b)(2) ..................................................................................................16, 50
§ 202(3)................................................................................................................50
§ 251(2)................................................................................................................50
§ 557.............................................................................................................50, 55
8 U.S.C.
§ 1103(a)(1) ..........................................................................................................50
§ 1225(b)(1)(B)(ii) ..................................................................................................5
§ 1225(b)(2)(A)......................................................................................................5
§ 1226(a) ...............................................................................................................5
§ 1226(c) ...............................................................................................................5
§ 1231(g)(1) ..................................................................................5, 16, 50, 56
§ 1231(g)(2) ...................................................................................................5, 55
18 U.S.C. § 4013 ...........................................................................................16, 51

28 U.S.C.

§ 530C(a)(4) ........ 16, 50
§ 1292(a)(1) ........ 4
§ 1331 ........ 3
§ 1367 ........ 3
§ 2671 ........ 34

CAL. CIV. CODE

§ 1670.9(a) ........ 8, 41
§ 1670.9(b) ........ 8, 41

CAL. GOV'T CODE

§ 7310(a) ........ 8, 41
§ 7310(b) ........ 8, 41

CAL. PENAL CODE

§ 5003.1(a) ........ 9
§ 5003.1(b) ........ 9
§ 5003.1(c) ........ 9
§ 5003.1(e) ........ 9, 40
§ 9500(a) ........ 10
§ 9500(b) ........ 10, 31
§ 9501 ........ 10, 31
§ 9502(c) ........ 37, 38, 40
§ 9502(e) ........ 37
§ 9505(a) ........ 10, 57, 58
§ 9505(b) ........ 11, 37, 40, 41, 42, 43

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ........ 50

**Other Authorities**

*Steps for Admission*, U.S. NAVAL ACAD., https://bit.ly/3p9KBgE ........ 39

THE FEDERALIST NO. 15 (Alexander Hamilton) (Garry Wills ed., 1982) ........ 2, 3

## INTRODUCTION

In enacting Assembly Bill 32 (AB-32), the State of California has asserted the authority to determine the means by the which the Federal Government may carry into execution its sovereign powers. Under AB-32, California has effectively prohibited the United States from using detention facilities operated by private contractors, including Appellant The GEO Group, Inc. (GEO), to house detainees in the custody of U.S. Immigration and Customs Enforcement (ICE). Although California purports to exercise this veto power over the Federal Government's immigration policy, it is well established that the Federal Government has the *sole* authority to control the borders of the United States and to detain individuals in anticipation of, or as a consequence of, federal immigration proceedings. AB-32 directly conflicts with the congressionally delegated discretion of the Secretary of Homeland Security and impermissibly requires the closure of five immigration detention facilities operated by GEO in California under contracts with the United States.

When the State of Maryland attempted to tax the operations of the Federal Government two centuries ago, Chief Justice John Marshall recognized this asserted power for what it was: the power to "arrest[] all the measures of the government" and to "chang[e] totally the character of" the Constitution by returning the Federal Government to the subordinate status it once suffered under the Articles of

Confederation. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 432 (1819). But unlike the Supreme Court in *McCulloch*, which blocked Maryland's assault on federal supremacy, the district court below *condoned* California's attempt to regulate federal officials in the execution of their federal duties. It held that AB-32 does not directly regulate the Federal Government in violation of the intergovernmental-immunity doctrine—even though the law will require the closure of *all* dedicated immigration detention facilities in California. It held also that AB-32 does not discriminate against the Federal Government—even though the State of California may exempt *all* of its private detention facilities without allowing the Federal Government to exempt *any* of its immigration detention facilities. And it held that AB-32 is not an obstacle to the execution of federal immigration law—even though a host of statutes express a clear and manifest intention of Congress to delegate broad authority to the Secretary of Homeland Security to select appropriate places of detention for removable aliens.

The district court's judgment below cannot stand. If the Supremacy Clause means anything, it means that the Federal Government may carry out its constitutional duties without deliberate interference from the states. The principal reason the Constitution was adopted was to prevent individual states from blocking the execution of laws adopted by the National Government. As Alexander Hamilton explained, under the Articles of Confederation, the "concurrence of thirteen distinct

sovereign wills [was] requisite . . . to complete execution of every important measure, that proceed[ed] from the Union." THE FEDERALIST NO. 15, at 87–88 (Alexander Hamilton) (Garry Wills ed., 1982). And because each state could "undertake to judge of the propriety of the measures themselves," there was "little prospect of [the measures] being executed at all." *Id.* at 87. The Government of the United States, "destitute of energy," *id.* at 83, was a mere "mimic sovereignty," *id.* at 82, a government-in-name-only that was neither effective at home nor respected abroad. The district court's strained attempts to reconcile AB-32 with the supremacy of federal law are not only unpersuasive on the merits, but, if accepted, threaten to launch the United States into a new "catalogue of . . . public misfortunes" that the Constitution was principally designed to avert. *Id.*

The Court should reverse the district court's erroneous denial of GEO's motion for a preliminary injunction and dismissal of GEO's intergovernmental-immunity and preemption claims, and remand with instructions for the district court to preliminarily or permanently enjoin enforcement of AB-32 against privately operated ICE facilities in California.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over GEO's federal-law claims under 28 U.S.C. § 1331 and supplemental jurisdiction over GEO's state-law claim under 28 U.S.C. § 1367.

On October 8, 2020, the district court issued its order denying in relevant part a preliminary injunction; dismissing all but one of GEO's claims related to its ICE facilities; and denying GEO declaratory and injunctive relief regarding application of AB-32's temporary safe harbor. *See* 1-ER-70–71; 1-ER-76. GEO timely noticed its appeal on November 6, 2020. *See* 3-ER-515.

This Court has appellate jurisdiction over the district court's denial of GEO's motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). The Court has pendent jurisdiction over the district court's dismissal of GEO's related claims. *See Meredith v. Oregon*, 321 F.3d 807, 814 (9th Cir.), *amended*, 326 F.3d 1030 (9th Cir. 2003); *see also Alto v. Black*, 738 F.3d 1111, 1122 (9th Cir. 2013).

## STATEMENT OF THE ISSUES

1. Whether AB-32 violates the doctrine of intergovernmental immunity, as applied to immigration detention facilities operated by private contractors, because it directly regulates the Federal Government or because it impermissibly discriminates against the Federal Government.

2. Whether AB-32, as applied to immigration detention facilities operated by private contractors, is preempted by federal immigration law.

3. Whether GEO's current contracts with ICE fall within AB-32's temporary safe harbor and are therefore valid through 2034.

## STATUTORY ADDENDUM STATEMENT

Pertinent constitutional provisions and statutes are set forth in the statutory addendum immediately following, and bound with, this brief. *See infra* pp. A1–A97.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Federal Immigration Detention Policy

Congress has authorized or required the detention of aliens under several different statutes. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018). Congress has further directed that "[t]he [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2).

Across the country, ICE's ability to house detainees is "already dire." 3-ER-430. As then-Acting Secretary of Homeland Security Kevin McAleenan said in April 2019: "It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity." *Id.* Homeland Security officials "are struggling to identify new locations where migrants can be held in detention." 3-ER-431.

Thus, ICE has determined that "additional ICE detention capacity is necessary" to meet the surge of aliens detained at the border. 3-ER-402. Indeed, "[a]n increase in detention capacity is critical to supporting ICE's ability to apprehend, detain, and remove aliens." 3-ER-415.

### B. GEO's ICE Detention Facilities In California

GEO is a publicly traded corporation that owns and operates detention facilities worldwide. As a contractor for the Federal Government, GEO currently operates five ICE detention facilities in California. 2-ER-257–58. First, GEO owns and operates the Adelanto ICE Processing Center, located in Adelanto, California, with a capacity of 1,940 beds. 2-ER-258. ICE and GEO entered the current contract for Adelanto on December 19, 2019, and it has a 15-year period of performance ending December 19, 2034. *Id*. ICE has the option of terminating the contract early every five years. *Id.*

Second, GEO owns and operates the Desert View Annex to the Adelanto facility, with a capacity of 750 beds. *Id*. It is incorporated into the same contract as the Adelanto facility. 2-ER-259. Desert View was previously used by the California Department of Corrections and Rehabilitation (CDCR) for state inmates, but CDCR phased out its contract and use of the facility in March 2020. 2-ER-258.

Third, GEO owns and operates the Mesa Verde ICE Processing Center, located in Bakersfield, California, with a capacity of 400 beds. 2-ER-259. Like the

Adelanto contract, the Mesa Verde contract has a 15-year period of performance ending December 19, 2034, and ICE has the option of terminating the contract early every five years. *Id.*

GEO's fourth and fifth facilities—Central Valley Annex and Golden State Annex—are operated as annexes to the Mesa Verde facility, each with a capacity of 700 beds. 2-ER-260–61. Both are former state prisons previously operated for CDCR. *Id*. Both facilities are incorporated into the Mesa Verde contract, with a period of performance running through December 19, 2034. *Id*.

In addition to the foregoing GEO facilities, ICE has two other dedicated detention facilities in California: Imperial Regional Detention Facility in Calexico, California (capacity of 704 beds) and Otay Mesa Detention Center in San Diego, California (capacity of 1,994 beds). 2-ER-261–62. Both facilities are operated by private contractors. *Id.* Thus, all dedicated ICE processing centers in California are privately operated.

### C. California's Early Efforts To Obstruct Federal Immigration Policy

Less than a month after the 2016 election, the California Legislature began enacting a series of measures designed to interfere with the execution of federal immigration policy, an effort that culminated in the enactment of AB-32.

On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the California Legislature. As enacted, the bill prohibits, among other things, city, county, and local

law enforcement agencies from entering into contracts "with the federal government or any federal agency or a private corporation to house or detain noncitizens for purposes of civil immigration custody" unless those contracts were in effect before January 1, 2018. CAL. CIV. CODE § 1670.9(a). The statute also prohibits the renewal or modification of such contracts thereafter "in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 1670.9(b).

On January 10, 2017, Assembly Bill 103 (AB-103) was introduced in the California Legislature. As enacted, AB-103 prohibits, among other things, city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody" unless those contracts were in effect before June 15, 2017. CAL. GOV'T CODE § 7310(a). The statute also prohibits the renewal or modification of such contracts thereafter "in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 7310(b).

### D. The Enactment Of AB-32

On December 3, 2018, AB-32 was introduced in the California Legislature, and Governor Newsom signed it into law on October 11, 2019. AB-32 builds on SB-29 and AB-103 by amending the California Penal Code in two principal ways.

First, it generally prohibits CDCR from contracting with private, for-profit prison facilities to house state inmates. As enacted, Section 1 of AB-32 prohibits CDCR from entering or renewing a "contract with a private, for-profit prison facility located in or outside of the state" to house or incarcerate state prison inmates. CAL. PENAL CODE § 5003.1(a), (b).

However, Section 1 of AB-32 also contains an exception permitting CDCR to "renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap." *Id.* § 5003.1(e). California's prison system is subject to a court-ordered population cap in which its total prison population may not exceed 137.5 percent of the prisons' design capacities. *See generally Brown v. Plata*, 563 U.S. 493 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. & N.D. Cal. 2013).[1]

[1] AB-32 also provides that "[a]fter January 1, 2028, a state prison inmate or other person under the jurisdiction of [CDCR] shall not be incarcerated in a private, for-profit prison facility." CAL. PENAL CODE § 5003.1(c).

Second, Section 2 of AB-32 generally prohibits the operation of a private detention facility in California, including a facility housing federal detainees. The prohibition is codified at Section 9501 of the California Penal Code: "Except as otherwise provided in this title, a person shall not operate a private detention facility within the state." Section 9500 defines the key terms as follows:

> (a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding.
>
> (b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity.

Section 9502 then enumerates a series of exceptions to Section 9501's prohibition on the operation of private detention facilities, but as discussed below, these exceptions apply almost exclusively to state private detention facilities, not to federal facilities. *See infra* Argument Part I.B.

Finally, Section 9505 contains two additional exceptions to the prohibition against the operation of private detention facilities set forth in Section 9501. The first, Section 9505(a), is a temporary safe-harbor provision:

> Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

The second, Section 9505(b), provides a more categorical exception at the option of the CDCR: "Section 9501 does not apply to . . . [a] private detention facility contract renewed pursuant to subdivision (e) of Section 5003.1." Subdivision (e) of Section 5003.1, as noted above, allows the CDCR to use private facilities "in order to comply with the requirements of any court-ordered population cap."[2]

Thus, since January 1, 2020 (the effective date of AB-32), the operation of a federal private detention facility is generally prohibited in California unless the relevant contract was in effect before January 1, 2020. In addition to precluding the opening of any new private detention facilities, AB-32 will ultimately cause the closure of all seven privately operated ICE facilities totaling 7,188 beds, which represent the overwhelming majority of immigration detention capacity held by the Federal Government in the State of California. *See* 2-ER-258–62. GEO manages five of the privately operated facilities for ICE, totaling 4,490 beds. 2-ER-258–61.

---

[2] In the Senate Rules Committee's analysis of AB-32, the Committee publicly anticipated that "this anti-immigrant President's Administration will likely sue California to enjoin this bill's enactment under various theories," including "by arguing that AB 32 is preempted by federal immigration law [and] that AB 32 violates the Intergovernmental Immunity Doctrine." 3-ER-464. Based on the advice of Dean Erwin Chemerinsky, however, the Committee concluded that "California is not regulating the federal government; it is regulating private companies, which is very much within the state's constitutional authority." 3-ER-465. As demonstrated below, *see infra* Argument Parts I, II, although the Committee's prediction was correct, its conclusion is demonstrably incorrect under controlling precedent.

## II. Prior Proceedings

GEO's complaint in the district court sought declaratory and injunctive relief against California's Governor and Attorney General, in their official capacities, prohibiting them from enforcing AB-32 against GEO's facilities operated under contract with ICE and the U.S. Marshals Service (USMS). 3-ER-510. GEO's complaint set forth four causes of action, two alleging that AB-32 violated the constitutional doctrine of intergovernmental immunity; one alleging that AB-32 was preempted by federal law; and one alleging that GEO's contracts with ICE were valid until at least December 19, 2034 under AB-32's safe-harbor provision. 3-ER-505–09. GEO moved for a preliminary and permanent injunction against enforcement of AB-32. 2-ER-246.

The United States also filed suit in the district court seeking to enjoin AB-32's application to ICE, USMS, and Bureau of Prisons (BOP) facilities operated by private contractors. 2-ER-243. The United States' complaint, like GEO's, alleged that AB-32 was preempted by federal law and violated the intergovernmental-immunity doctrine. 2-ER-242–43. And, like GEO, the United States moved for a preliminary and permanent injunction. 2-ER-181–83.

The State opposed GEO's and the United States' preliminary-injunction motions, moved to dismiss GEO's complaint under Federal Rule of Civil Procedure 12(b)(6), and moved for judgment on the pleadings against the United States under

Rule 12(c). 2-ER-109; 2-ER-178. With the agreement of the parties, the district court consolidated the two cases. 2-ER-90–91.

On October 8, 2020, the district court granted in part and denied in part the motions for a preliminary injunction. 1-ER-76. The court enjoined enforcement of AB-32 as applied to USMS facilities operated by private contractors, holding that it was preempted by federal law and that the remaining preliminary-injunction factors had been satisfied. *See* 1-ER-37–39; 1-ER-42; 1-ER-72–76. However, the court denied relief, and dismissed the plaintiffs' intergovernmental-immunity and preemption claims, as applied to ICE facilities. *See* 1-ER-35–37; 1-ER-42–51; 1-ER-53–71. The district court also denied GEO's request for a declaration that its contracts with ICE were covered by AB-32's temporary safe harbor. 1-ER-72–73.

GEO timely noticed its appeal on November 6, 2020, 3-ER-515; the United States timely noticed its appeal on December 7, 2020, 3-ER-513; and the United States and California have asked this Court to consolidate the two appeals, *see* Joint Mot. To Consolidate Cases & Align Briefing Schedules, *United States v. Newsom*, No. 20-56304, Doc. 10-1 (9th Cir. Dec. 15, 2020).

## SUMMARY OF ARGUMENT

The Supreme Court has long held that the Supremacy Clause prohibits state interference with the implementation of federal law through two interrelated doctrines: (1) intergovernmental immunity and (2) preemption. *See North Dakota v.*

*United States*, 495 U.S. 423, 434 (1990) (plurality opinion). By preventing federal immigration authorities from utilizing private contractors to detain aliens pending removal, AB-32 violates these doctrines in at least three ways.

First, it is settled that, under the intergovernmental-immunity doctrine, generally applicable state laws are invalid if they substantially interfere with federal operations. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167 (1976); *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534 (1958); *Johnson v. Maryland*, 254 U.S. 51 (1920); *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014).

Under any reasonable application of these precedents, AB-32 is unconstitutional. The statute directly interferes with the detention operations that the Federal Government engaged GEO to perform by effectively prohibiting ICE from utilizing private contractors to carry them out, resulting in the closure of *all* dedicated federal immigration detention facilities in California. The district court instead held that AB-32 does not directly regulate the Federal Government because it concluded that governing precedent requires the "legal incidence" of a regulation to fall on the Federal Government or a "federal instrumentality," and it believed that the "legal incidence" of AB-32 fell only on GEO, which the court maintained was not a "federal instrumentality." *See* 1-ER-53–59.

None of these holdings withstands scrutiny. First, the "legal incidence" test, which the district court drew from the Supreme Court's *tax* immunity cases, does

not apply in direct-regulation cases. Many of the Supreme Court's landmark direct-regulation cases struck down state laws whose legal incidence did not fall on the Federal Government. Moreover, even if a "legal incidence" test did apply in the direct-regulation context, it was clearly satisfied here because AB-32 substantively regulates the contractual relationship between the Federal Government and its contractors. Its incidence thus falls on *both* contracting parties. Finally, even if the legal incidence of AB-32 is relevant, and even if it falls only on GEO, the statute *still* violates the intergovernmental-immunity doctrine because GEO is a "federal instrumentality" performing an important governmental function.

Second, AB-32 unlawfully discriminates against the Federal Government and its detention contractors. Although AB-32 requires *all* privately operated federal immigration detention facilities in California to shut down once their current contracts expire, it does *not* require the State of California to shut down *any* of its privately operated detention facilities, since all such facilities are exempt from AB-32's prohibition. The district court resisted this conclusion based entirely on its decision to assess the discriminatory effect of each of AB-32's exemptions in isolation, even though binding Supreme Court precedent demands that the discriminatory effect of state statute be analyzed by looking at the statutory scheme *as a whole*. Indeed, the district court's elevation of form over substance gives states a roadmap to evade the Constitution through clever drafting of their regulations.

Third, AB-32 is preempted because it poses an obstacle to the purposes and objectives of federal immigration law. Under both Supreme Court and Circuit precedent, state laws are preempted to the extent they shrink the congressionally delegated discretion of federal officials in the performance of their federal duties.

A host of federal statutes, both alone and in combination, clearly grant the Secretary of Homeland Security broad authority to contract with private entities for the detention of removable aliens. *See, e.g.*, 6 U.S.C. § 112(b)(2); 8 U.S.C. § 1231(g)(1); 18 U.S.C. § 4013 note "Contracts for Space or Facilities"; 28 U.S.C. § 530C(a)(4). The State of California may not directly undermine those grants of authority—and directly interfere with the Federal Government's contracting authority—by prohibiting the Secretary from contracting with private detention providers, even as he determines that the national interest demands it.

The district court's contrary holding rested on two clear mistakes. First, the district court wrongly applied the so-called "presumption against preemption" that only obtains when Congress regulates in an area of traditional state concern. Although California has a traditional police power to protect the health and safety of its residents generally, the district court pointed to no historic role for state legislation in the protection of alien detainees *in federal custody*. Likewise, it can hardly be said that the State's historic police powers extend to regulating the Federal Government's contracts, which are governed exclusively by federal law. Second, in

applying the presumption against preemption, the district court wrongly focused on whether Congress expressed a clear intent *for ICE to use private detention facilities*—an irrelevant question under obstacle-preemption doctrine. Had the district court engaged in the correct analysis—asking only whether Congress expressed a clear intent that the Secretary of Homeland Security *possess broad discretion* to contract with private detention facilities—the answer is obvious that AB-32 irreconcilably conflicts with federal immigration law.

Although AB-32 clearly violates federal law, the district court should have, at the very least, granted the alternative relief GEO sought: a declaration that GEO's recent contracts with ICE fall within AB-32's temporary safe harbor and an injunction preventing the State from enforcing AB-32 against GEO's facilities until 2034. GEO's contracts with ICE expressly state that their period of performance is fifteen years. The district court's conclusory rejection of GEO's alternative claim for relief was therefore erroneous.

## STANDARD OF REVIEW

The Court reviews the district court's denial of a preliminary injunction for abuse of discretion. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). In doing so, the Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Id.*

The Court reviews de novo the granting of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204 (9th Cir. 2020).

**ARGUMENT**

"A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). As articulated by the Supreme Court, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction by showing serious questions go to the merits of its claims and a balance of hardships that tips sharply towards the plaintiff, so long as it makes a showing on the other two factors." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (cleaned up).

The court below based its denial of relief with respect to GEO's ICE facilities entirely on its dismissal of GEO's intergovernmental-immunity and preemption claims for failure to state a claim. *See* 1-ER-71. The reasoning supporting the district court's conclusion that the other preliminary-injunction factors favored GEO with respect to application of AB-32 to GEO's USMS facility, *see* 1-ER-73–76, applies

with equal force to the ICE facilities. Accordingly, GEO's motion for a preliminary injunction turns entirely upon the correctness of the district court's merits rulings on GEO's intergovernmental-immunity and preemption claims.

## I. AB-32 Is Unconstitutional As Applied to GEO's ICE Facilities Because It Violates the Intergovernmental-Immunity Doctrine.

The Supremacy Clause provides that the "Laws of the United States" made in pursuance of the Constitution "shall be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. More than two hundred years ago, in the foundational case of *McCulloch v. Maryland*, the Supreme Court recognized that this guarantee of federal supremacy would be meaningless if the Federal Government were not immunized from regulation and taxation by the states.

In *McCulloch*, Maryland had attempted to enforce a state tax against a branch of the Bank of the United States. 17 U.S. (4 Wheat.) 316, 317–21 (1819). The Supreme Court held that the supremacy of the Federal Government within its legitimate sphere of action necessarily meant that the states had no power to interfere with a constitutionally valid federal activity. *Id.* at 427–30. Because "the power to tax involves the power to destroy," the Court held that Maryland's tax was unconstitutional. *Id.* at 431.

In so holding, the Court set forth the canonical formulation of the intergovernmental-immunity doctrine: "[T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the

constitutional laws enacted by congress to carry into execution the powers vested in the general government." *Id.* at 436. In short, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Accordingly, state laws are invalid if they "regulate[] the United States directly or discriminate [] against the Federal Government or those with whom it deals." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (quoting *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (plurality opinion)) (alteration in *Boeing*).

AB-32 violates both of these intergovernmental-immunity tenets, for it directly regulates the Federal Government *and* discriminates against the Federal Government and its contractors. The district court's contrary holdings find no basis in law or logic.

### A. AB-32 Directly Regulates the Federal Government's Immigration Detention Operations.

A state violates the doctrine of intergovernmental immunity when it purports to directly regulate the Federal Government. *See North Dakota*, 495 U.S. at 436. Direct regulation can manifest itself in different ways. For example, a state may not require the Federal Government to obtain a permit or license to carry out a federal function, even if the permit or license requirement is generally applicable. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (state could not require federal contractor to obtain a state permit to operate an air contaminant source); *Mayo*,

319 U.S. at 447–48 (Secretary of Agriculture could not be required to submit to state inspection and pay inspection fee for fertilizer imported into the state); *Boeing Co.*, 768 F.3d at 839–42 (state could not regulate the way in which a contractor conducted environmental remediation on behalf of the Federal Government).

While generally applicable laws do not run afoul of intergovernmental immunity if they incidentally and minimally burden federal activities, *see Hancock*, 426 U.S. at 179, such laws are unconstitutional to the extent that they substantially interfere with federal operations, *see id.* at 180; *Mayo*, 319 U.S. at 447–48; *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). Or, as the Supreme Court long ago expressed the principle, state laws run afoul of intergovernmental immunity when they "involve[] a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of the [federal] functions." *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945).

The same principle holds true when general state laws are applied to federal activities carried out by federal contractors. In *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court held that "the right of the State to control [a federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id.* at 867 (Marshall, C.J.). The rule announced in *Osborn* has been repeatedly

reaffirmed by the Supreme Court. In *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988), the Supreme Court held that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Id.* at 181.[3] Because states can just as readily interfere with federal operations by regulating the activities of federal contractors as by regulating the activities of federal employees, the doctrine must extend to both. *See Hancock*, 426 U.S. at 174 n.23, 180 (generally applicable environmental regulations invalid as applied to a private contractor operating federal uranium-enrichment facility); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (state could not require a federal contractor to obtain a license before constructing facilities at an Air Force base); *see also United States v. City of St. Paul*, 258 F.3d 750, 754 (8th Cir. 2001).

In line with these precedents, this Court has squarely held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land. In *Boeing Co. v. Movassaghi*, California enacted a statute imposing

[3] The Court ultimately held that the state regulation could be applied to the nuclear facility because federal law authorized the state's workers' compensation scheme. *Goodyear Atomic Corp.*, 486 U.S. at 182. But the important point is that the Supreme Court drew no distinction between federal activities carried out by federal employees and federal activities carried out by federal contractors for purposes of intergovernmental immunity.

environmental-remediation standards on a site that had been contaminated by the Federal Government and its contractor, Boeing, with radiological material over the course of several decades. 768 F.3d at 837–38. A small portion of the site was owned by NASA, but the remainder of the site was owned by Boeing. *Id.* at 834. Because the radiological contamination was entirely the result of federal activity, the Federal Government had taken responsibility for remediating it. *Id.* at 835, 839. The Government contracted with Boeing to implement the remediation of the site under federal direction. *Id.* at 836.

Even though the statute purportedly applied to Boeing as a private contractor conducting federal activities at a site that was owned almost entirely by Boeing, the Court held that California's statute constituted an impermissible direct regulation of federal activities. The statute "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which Boeing render[ed] services that the federal government hired Boeing to perform"; it "replace[d] the federal cleanup standards that Boeing ha[d] to meet to discharge its contractual obligations to [the Federal Government] with the standards chosen by the state"; and it "regulate[d] not only the federal contractor but the effective terms of federal contract itself." *Id.* at 840. Relying on *Goodyear Atomic Corp.*, the *Boeing* Court held that "[t]he federal government's decision to hire Boeing to perform its cleanup work d[id] not affect the legal analysis." *Id.* at 839. As this Court subsequently observed: "For purposes

of intergovernmental immunity, federal contractors are treated the same as the federal government itself." *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

In the face of these binding precedents, the district court nonetheless dismissed GEO's direct-regulation claim based on a legal test endorsed by neither California nor any direct-regulation precedent. According to the court, a state law only violates intergovernmental immunity if the "legal incidence" of the regulation falls "directly on the United States" or on "instrumentalities of the Federal Government." 1-ER-56. Because the district court found that the legal incidence of AB-32 fell on GEO, and because it found that GEO is not an "instrumentality" of the Federal Government, the court concluded that GEO could not plausibly state an intergovernmental-immunity claim. *See* 1-ER-53–59. The district court's analysis was flawed in three respects. Each of these errors, standing alone, compels reversal.

#### 1. The legal-incidence test does not apply in regulatory-immunity cases.

First, the district court incorrectly held that the "legal incidence" of AB-32 must fall on the Federal Government for the law to constitute an unconstitutional direct regulation, but the legal-incidence test applies only in *tax* immunity cases. The Supreme Court has held that "States may not impose taxes . . . the legal incidence of which falls on the Federal Government." *United States v. Fresno County*, 429 U.S. 452, 459 (1977). Generally, the "legal incidence" of a tax falls on he "who is

ultimately obligated to pay the tax," *Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1085 (9th Cir. 2011), and the "person or entity bearing the legal incidence of the tax is not necessarily the one bearing the economic burden," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 681 (9th Cir. 2004). Thus, the Supreme Court has held that even when "the Federal Government shoulders the entire economic burden of the levy," so long as a nondiscriminatory tax's legal incidence falls on a private party, the tax does not transgress intergovernmental immunity. *United States v. New Mexico*, 455 U.S. 720, 734 (1982).

The district court cited no precedent, and we are aware of none, applying the legal-incidence test in a regulatory-immunity case. Instead, the court quoted Justice Brennan's statement in *North Dakota* that "state taxes and regulations are subject to the same restrictions under the federal immunity doctrine." 495 U.S. at 454 n.3 (Brennan, J., concurring in the judgment in part and dissenting in part); *see* 1-ER-54. But Justice Brennan was simply observing that both taxes and regulations are unconstitutional insofar as they "obstruct federal operations." 495 U.S. at 454 n.3. Pointedly, Justice Brennan also emphasized that the Court's language in its "tax cases was never intended to delineate the full scope of the [intergovernmental-immunity] doctrine," because "[r]egulations . . . present a wider range of possibilities for interference with federal activities than do taxes." *Id.*

Indeed, the Supreme Court's willingness to uphold "nondiscriminatory taxes imposed on those with whom the Federal Government deals" has rested in large part on the Court's assumption that such a tax "does not . . . render the [federal official's] task more difficult or cumbersome." *Id.* (quoting *Cal. Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 850, n.6 (1989)) (alterations in *North Dakota*). But simply because "nondiscriminatory taxes have not been found to obstruct federal operations *does not mean that nondiscriminatory regulations can be assumed to be equally harmless*, as [the Court's] cases make evident." *Id.* (emphasis added). So, far from supporting the district court's approach—which treated state taxes identically to state regulations—Justice Brennan's opinion in *North Dakota* recognizes that the intergovernmental-immunity doctrine is not identical in the taxation and regulation contexts because of the greater threat posed by regulation.

Justice Brennan's understanding of intergovernmental immunity is well grounded in the Supreme Court's precedents. Consider, for example, *Public Utilities Commission of California v. United States*, 355 U.S. 534 (1958) ("*California Commission*"), a case characterized by Justice Brennan as fundamentally incompatible with any legal-incidence test drawn from the Court's tax-immunity cases. *See North Dakota*, 495 U.S. at 454 n.3. There, California prohibited common carriers from transporting federal property at reduced rates without first obtaining the permission of the State's Public Utilities Commission. *Cal. Comm'n*, 355 U.S.

at 535–39. The question presented to the Court was therefore "whether the United States can be subjected to the discretionary authority of a state agency for the terms on which, by grace, it can make arrangements for services to be rendered it." *Id.* at 539. In answering that question, the Supreme Court "la[id] to one side th[o]se cases which sustain nondiscriminatory state taxes on activities of contractors and others who do business for the United States, as their impact at most is to increase the costs of the operation," because the state regulation in *California Commission* instead "place[d] a prohibition on the Federal Government." *Id.* at 543–44.

In describing the State regulation as placing a "prohibition on the Federal Government," the Court in *California Commission* was not addressing the legal incidence of the regulation. After all, the legal incidence of the challenged regulation unquestionably fell only upon "[e]very common carrier" that was "subject to the provisions" of the California Public Utilities Code, not on the Federal Government. *Id.* at 535. But the Court nonetheless invalidated the regulation because of "[t]he seriousness of the impact of California's regulation on the action of federal procurement officials," *id.* at 544—without regard for which entity bore the legal incidence of the regulation.

Numerous other direct-regulation cases confirm that legal incidence has never been the *sine qua non* of constitutional invalidity under the intergovernmental-immunity doctrine. In *Hancock v. Train*, 426 U.S. 167 (1976), for example,

Kentucky mandated that "[n]o person" could operate an air-contaminant source without a state permit. *Id.* at 172–73. Federal contractors operated the air-contaminant source at issue in *Hancock*, *see id.* at 174 n.23, and the "legal incidence" of the regulation fell on them, not the Federal Government. Nonetheless, the Supreme Court did not hesitate to strike down Kentucky's law as an impermissible direct regulation of the Federal Government. And it did so precisely because the state law, *in effect*, "place[d] a prohibition on the Federal Government." *Id.* at 180 (quoting *California Commission*, 355 U.S. at 544); *see also Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (invalidating a state driver's license law whose legal incidence fell on a Postal employee personally because it interfered with federal operations).

Similarly, this Court held that intergovernmental tax-immunity precedents invoked by California in *Boeing* were "inapposite as they discuss[ed] generally applicable state tax laws, which *resulted in merely an increased economic burden on federal contractors* as well as others." 768 F.3d at 839 (emphasis added). Those intergovernmental tax-immunity cases were inapposite precisely because the "tax laws did not regulate what the federal contractors had to do or how they did it pursuant to their contracts." *Id.* "Unlike the tax cases, [the state law in *Boeing*] regulate[d] not only the federal contractor but the effective terms of [the] federal contract itself." *Id.* at 840.

*Boeing*, like *Hancock* and *California Commission*, therefore embraced a pragmatic approach to intergovernmental immunity from State regulation in which the practical effect of state laws is decisive. This Court did not mention, let alone rely upon, any concept of "legal incidence" drawn from the taxation context. To be sure, if the legal incidence of a regulation falls on the Federal Government, that might be *evidence* that the regulation substantially interferes with federal operations in violation of the intergovernmental-immunity doctrine, *see, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010), but *California Commission*, *Hancock*, *Johnson*, and *Boeing* all show with crystal clarity that the constitutionality of such a regulation certainly does not *depend* on legal incidence. Indeed, under the district court's legal-incidence test, *California Commission*, *Hancock*, and *Johnson* would all have come out the other way.

Once shorn of the district court's erroneous "legal incidence" test, the substantial interference with federal operations posed by AB-32 is obvious. As in *Boeing*, the activity being carried out by GEO—operating federal immigration detention facilities—is a federal activity. *See also Goodyear Atomic Corp.*, 486 U.S. at 180–81; *California Commission*, 355 U.S. at 544; *Leslie Miller, Inc.*, 352 U.S. at 189–90. In fact, the activity at issue here is *inherently* federal: *only* the Federal Government or its authorized contractor may detain aliens. *See California*, 921 F.3d at 882–83. And as in *Boeing*, California seeks to "directly interfere[] with the

functions of the federal government" with respect to the detention of aliens. 768 F.3d at 840. Indeed, while in *Boeing* California only sought to regulate *how* the contractor carried out its federal activities, here California seeks to *prohibit* the contractor from carrying out an activity that only the Federal Government can perform, a paradigmatic violation of intergovernmental immunity that makes this an easy case. *See Hancock*, 426 U.S. at 179–80.

At bottom, AB-32 effectively prohibits the Federal Government from using *any* private immigration detention facilities in California, requiring it instead to own or directly operate such facilities using federal employees. It is undisputed that once AB-32 takes full effect *every dedicated ICE detention center in California* would be required to shut down, leaving only a few non-dedicated facilities capable of housing only a small fraction of the average daily population of ICE detainees in the State. *See* 3-ER-476–77. This restriction constitutes substantial interference under any definition of that phrase, and AB-32 is therefore unconstitutional.

**2. The district court clearly erred by concluding that the legal incidence of AB-32 fell on GEO alone.**

To determine legal incidence in the tax immunity context, courts must "conduct a fair interpretation of the taxing statute as written and applied." *Coeur D'Alene Tribe of Idaho*, 384 F.3d at 681 (quotation omitted). In doing so, they must "ascertain [] the legal obligations imposed upon the concerned parties." *Id.* (quotation omitted) (alteration in *Coeur D'Alene Tribe*).

The text and structure of AB-32 make clear that any fair interpretation of the law places the legal incidence of the regulation on *both* GEO and the Federal Government. AB-32 defines a "[p]rivate detention facility" as "a detention facility that is operated by a private, nongovernmental, for-profit entity, and *operating pursuant to a contract or agreement with a governmental entity*." CAL. PENAL CODE § 9500(b) (emphasis added). And apart from its exceptions, AB-32 states that "a person shall not operate a private detention facility within the state." *Id.* § 9501. Read in conjunction with Section 9500(b), Section 9501 therefore prohibits any private person from operating a detention facility "pursuant to a contract or agreement with a governmental entity."[4]

The plain language of AB-32 shows that the law operates *only* on those persons who act pursuant to a government contract and in doing so it necessarily regulates *both* contracting parties. Of course, AB-32 requires that GEO not operate its California ICE detention facilities. But it also regulates the Federal Government because *the law itself* defines its object of regulation by reference to contractual

[4] The district court seemed to imply that GEO conceded at the oral hearing that because AB-32's text "focuses on the person operating the facility," 1-ER-56 (quoting 2-ER-85), the legal incidence of AB-32 did not fall on the Federal Government. Not so. Rather, GEO emphasized that the text of Section 9501 defined the prohibited conduct by reference to "private detention facilities," which is defined by reference to a government contract. That nexus between AB-32's prohibition and the government contract means, as GEO argued, that AB-32 is "necessarily a direct regulation, a direct prohibition on all governments to use a private for-profit entity." 2-ER-85.

relationships with governmental entities and regulates the substance of the contracts so referenced. *See United States v. California*, No. 2:18-CV-721-WBS-DB, 2018 WL 5780003, at *3–4 (E.D. Cal. Nov. 1, 2018) (holding that a state statute regulating purchaser of federal land necessarily regulated the Federal Government directly). Indeed, nearly a century ago, the Supreme Court endorsed the notion that there exists a difference between a tax on a government contractor—on which the legal incidence falls on the contractor's property—and a tax or regulation touching upon a government contract itself. *See James v. Dravo Contracting Co.*, 302 U.S. 134, 155 (1937) (explaining that intergovernmental immunity is not violated "so long as [the Federal Government's] contract and its execution are not interfered with," and nondiscriminatory taxes on federal contractors are constitutional because "the contract alone, and not the contractor, is exempt from taxation or other interference by the State government" (quotation omitted)).

AB-32 plainly regulates—and interferes with the execution of—Federal Government contracts. AB-32 is entirely unlike taxing statutes that merely regulate federal contractors incidentally and do so without directly affecting the execution of the contractors' work for the Federal Government. As this Court made clear in *Boeing*, when state law "regulates not only the federal contractor but the effective terms of federal contract itself," *Boeing Co.*, 768 F.3d at 840, it necessarily regulates

the Federal Government and "directly interferes with [its] functions." *Id.*; *see also United States v. Virginia*, 139 F.3d 984, 990 (4th Cir. 1998).

### 3. GEO's ICE facilities are "federal instrumentalities."

"[T]here is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality." *Dep't of Emp. v. United States*, 385 U.S. 355, 358–59 (1966). But, at the very least, the case law indicates that an entity is an "instrumentalit[y] of the federal government" when "engaged in the performance of an important governmental function." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 102 (1941); *see also Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982); *United States v. Michigan*, 851 F.2d 803, 806 (6th Cir. 1988).

GEO plainly meets that requirement. Indeed, one could scarcely think of a more fundamental function of government than the physical detention of individuals for law-enforcement purposes. *See Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998); *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Just as federal land banks are federal instrumentalities as "depositaries of public moneys," *Smith v. Kan. City Title & Tr. Co.*, 255 U.S. 180, 209 (1921), so too are detention-service providers federal instrumentalities as custodians of persons accused of violating federal law.

The district court nevertheless concluded that GEO's ICE facilities were not "federal instrumentalities" by erroneously relying on two inapposite cases—*Logue v. United States*, 412 U.S. 521 (1973), and *United States v. Boyd*, 378 U.S. 39 (1964). In *Logue*, the Supreme Court, interpreting the Federal Tort Claims Act (FTCA), held that the Federal Government could not be held liable for the alleged negligence of county jail employees operating under a contract with the Federal Government to house federal prisoners. But the Court reached that holding precisely because the FTCA expressly provided that while liability extends to every "employee of the [Federal] Government," including those employed by "corporations primarily acting as instrumentalities or agencies of the United States," it "does not [cover] any contractor with the United States." 412 U.S. at 526 (quoting 28 U.S.C. § 2671). That statutory definition of "employee of the [Federal] Government"—which categorically excludes federal contractors from its scope—has no bearing on the *constitutional* question of when a particular contractor is "engaged in the performance of an important governmental function." *Fed. Land Bank of St. Paul*, 314 U.S. at 102; *see United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016).

And while *Boyd* held that federal contractors operating or maintaining an Atomic Energy Commission plant were not federal instrumentalities, *see* 378 U.S. at 44–50, it did so based upon an outdated legal test. Since *Boyd* was decided, this

Court has now stated definitively that "[t]he test for determining whether an entity is a federal instrumentality for purposes of protection from state or local action or taxation . . . is very broad: whether the entity performs an important governmental function." *Lewis*, 680 F.2d at 1242 (citing *Fed. Land Bank of St. Paul*, 314 U.S. at 102; *Rust v. Johnson*, 597 F.2d 174, 178 (9th Cir. 1979)). Under that legal standard, GEO's ICE facilities are plainly federal instrumentalities. And because the legal incidence of AB-32 falls on federal instrumentalities, AB-32 violates the intergovernmental-immunity doctrine even under the inapposite legal-incidence test.

### B. AB-32 Unlawfully Discriminates Against the Federal Government.

The Supremacy Clause prohibits states from "defeat[ing] the legitimate operations of a supreme government" by discriminating against the Federal Government. *McCulloch*, 17 U.S. (4 Wheat.) at 427. If a state legislature had the authority to regulate the Federal Government's operations without imposing the same regulation on the state's own activities, it could do so without fear of political repercussion from its constituents. *Id*. at 128; *South Carolina v. Baker*, 485 U.S. 505, 525 n.15 (1988). Thus, "[t]he nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437–38 (plurality opinion). And because the Federal Government often uses private contractors to carry out its activities, the nondiscrimination principle protects federal contractors just as it protects the Federal

Government itself. *Id.* at 438; *California*, 921 F.3d at 882 n.7. Accordingly, a state must "treat those who deal with the [Federal] Government as well as it treats those with whom it deals itself." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960); *see also Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814–15 (1989); *Boeing*, 768 F.3d at 842–43.

In applying the non-discrimination principle, the key question is whether the state law in question "treat[s] similarly situated persons differently." *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019). Importantly, "the State's interest in adopting the discriminatory [law], no matter how substantial, is simply irrelevant." *Id.* at 704 (quotation marks omitted). Instead, in assessing whether two classes are similarly situated, courts ask whether there are "significant difference[s]" between the state and federal classes. *Id.*; *Davis*, 489 U.S. at 815–16; *Phillips Chem. Co.*, 361 U.S. at 383.

Two undisputed facts make clear that AB-32 does, in fact, discriminate against the Federal Government. First, AB-32 requires *all* privately operated federal immigration detention facilities in California to shut down once their current contracts expire. Second, AB-32 does *not* require the State of California to shut down *any* of its privately operated detention facilities, since all such facilities are exempt from AB-32's prohibition. Despite GEO's repeated request below,

California has not identified *a single private detention facility* that it will be required to close because of AB-32; nor did the district court identify any such facility.

AB-32 accomplishes this discrimination in two steps. Section 9501 generally prohibits any person from operating a private detention facility in California. If that is all that AB-32 did, it would not discriminate against the Federal Government, since it would apply equally to federal and state contractors alike. But AB-32 then uses a series of provisions in Sections 9502 and 9505 to effectively exempt *all* state private detention facilities from Section 9501's general prohibition.

The State never disputed that the exemptions contained in Sections 9502(a)–(b), 9502(d)–(g), and 9505(b) apply *exclusively* to state detention facilities. By their own terms, these exemptions are limited to facilities operating under California law, thereby facially excluding federal detention facilities.[5] The most important of these exemptions is Section 9505(b), which is limited to CDCR facilities and allows the State to exempt *its entire prison system* from AB-32's prohibition. The other two exemptions contained in the statute—Sections 9502(c) and 9505(a)—apply to state and federal contractors alike, but *Dawson* makes clear that the discrimination analysis focuses on those provisions that impose *differential* treatment, not those that

[5] The only one of these exemptions that is not framed in terms of state law is Section 9502(e), but it is undisputed that it has no potential application to federal operations. Even if it did, it would be irrelevant to the discrimination analysis. *See Dawson*, 139 S. Ct. at 705.

treat state and federal entities the same. *See Dawson*, 139 S. Ct. at 705. Sections 9502(c) and 9505(a) are therefore irrelevant to the discrimination analysis. *See id.*; *United States v. City of Manassas*, 830 F.2d 530, 533 (4th Cir. 1987) (state statute unconstitutionally discriminated against the Federal Government even though it treated the state and Federal Governments alike in most respects), *aff'd*, 485 U.S. 1017 (1988). The result is a statute that *purports* to generally prohibit state and federal private detention facilities but *in fact* prohibits only federal private detention facilities: a classic form of discrimination.

The district court evaded this conclusion by examining each exemption *in isolation* and asking whether it discriminated against the Federal Government. *See* 1-ER-62–69. For example, it concluded that, because "neither GEO nor the United States operates any of the facilities enumerated in the Section 9502 exception" (other than facilities under Section 9502(c)), GEO and the United States "are not similarly situated to California." 1-ER-64. But this fundamentally misunderstands the discrimination inquiry. As the Supreme Court has instructed, the discriminatory effect of a state statute is analyzed by looking at the statutory scheme *as a whole*, not by examining each exception in isolation. *See Dawson*, 139 S. Ct. at 705; *Washington v. United States*, 460 U.S. 536, 541–46 (1983).

And that makes perfect sense. If the discrimination analysis focused on each statutory exception in isolation, a state could easily evade the intergovernmental-

immunity doctrine. For example, suppose that Section 1 of a Maryland statute required instructors at any government-operated educational institution to obtain a state teaching license. Section 2(a) of the statute then exempted all K-12 educational institutions, and Section 2(b) of the statute exempted all post-secondary educational institutions that allow for the admission of married individuals. Such a statute would have the effect of regulating *only* instructors of the United States Naval Academy at Annapolis. While it is true that the Federal Government does not provide any K-12 education or post-secondary education for married individuals in the State of Maryland,[6] it would be absurd to say that such a statute does *not* discriminate against the Federal Government. Such a statute could just as easily be rewritten to say, in express terms, that only instructors at the Naval Academy must obtain teaching licenses, and clever drafting to obtain that result without explicitly naming the Naval Academy should not change the analysis.

That is exactly what California has done: rather than imposing a general prohibition and exempting every state private detention facility through a series of exemptions, AB-32 could just as easily have been written to say, in express terms: "Except as otherwise provided in this title, a person shall not operate a private detention facility *on behalf of the Federal Government* within the state."

[6] *See Steps for Admission*, U.S. NAVAL ACAD., https://bit.ly/3p9KBgE (last visited Dec. 22, 2020).

To justify its exemption-by-exemption analysis, the district court relied on *United States v. Nye County*, 178 F.3d 1080 (9th Cir. 1999), but that decision reaffirmed the principle that statutory exemptions must be "assess[ed] . . . in light of the [regulatory] statute as a whole." *Id.* at 1087. *Nye* made a narrow exception for cases "[w]here . . . the statute contains a series of exemptions, some of which favor the federal government, others of which favor the state, most of which are unconcerned with the federal/state distinction." *Id.* at 1088. In other words, if there are cross-cutting exemptions to a general rule, there is little danger that the state is trying to circumvent intergovernmental immunity by crafting a discriminatory regime. But here, *none* of AB-32's exemptions discriminate in favor of the Federal Government over the State, so *Nye* is inapplicable.

The district court cited Section 5003.1 in support of its conclusion that *Nye* governed. That provision applies certain prohibitions only to CDCR facilities, including a prohibition on the use of out-of-state private detention facilities, and the district court thought that this showed that AB-32 had some provisions benefitting the United States. *See* 1-ER-62. But that ignores two important points. First, even though Section 5003.1's prohibitions only apply to CDCR facilities, the State can escape those prohibitions by invoking the exemptions in Sections 5003.1(e), 9505(b) and 9502(c). Second, *Nye*'s exemption-by-exemption analysis only applies where there are cross-cutting *exemptions*, and the provisions of Section 5003.1 relied on by

the district court are *not* exemptions. The only exemption in that part of the statute discriminates, on its face, against the Federal Government. *Nye* is inapplicable, and under the whole-statute analysis mandated by Supreme Court precedent, AB-32 clearly discriminates against the United States.[7]

Even under an exemption-by-exemption approach, however, AB-32 is still invalid. This Court has previously held that CDCR facilities and federal immigration detention facilities must be treated the same way for purposes of intergovernmental immunity. *California*, 921 F.3d at 885. The district court nonetheless concluded that Section 9505(b) does not discriminate against federal immigration detention facilities because CDCR facilities are subject to a court-imposed population cap, while federal facilities are not. 1-ER-67–68.

But again, there are two problems with that argument. First, as *Dawson* reiterated, a state may only point to significant differences in the statutory text *that actually explain the discrimination* between the state and federal entities. 139 S. Ct. at 706. Thus, if a state law "extends a special" benefit to state entities and "categorically denies that same benefit" to federal entities, it is irrelevant whether there is some *potentially* lawful basis for distinguishing between the state and federal

---

[7] Moreover, although Section 5003.1 only applies to the State's CDCR contracts, *other* provisions of California law impose very similar restrictions on federal immigration detention contracts, *see* CAL. CIV. CODE § 1670.9(a)–(b); CAL. GOV'T CODE § 7310(a)–(b), so it is inaccurate to say that California law imposes singularly burdensome restrictions on CDCR contracts.

entities. "Even if [a federal entity] turned out to be *identical* to a [state entity for purposes of the exemption], the law as written would deny [the federal entity the] exemption." *Id.* That is the case here. Section 9505(b) is limited, on the face of the statute, to CDCR facilities, so even if federal detention facilities *were* operating under a court-imposed population cap, they would *still* fail to qualify for Section 9505(b)'s exemption. That shows that Section 9505(b) does *not* draw a distinction based on population caps; it draws a distinction based on *which governmental entity* is operating the detention facility, which is exactly what it *may not* do. *See Dawson*, 139 S. Ct. at 706; *Barker v. Kansas*, 503 U.S. 594, 599 (1992); *Davis*, 489 U.S. at 817; *Phillips Chem. Co.*, 361 U.S. at 384–85.

Second, although the district court thought that it was rational to treat facilities subject to a court-ordered population cap differently from those that are not, whether "the State has a rational reason for discriminating between two similar groups of [facilities]" is "wholly beside the point" when conducting an intergovernmental-immunity discrimination analysis. *Davis*, 489 U.S. at 816. "The State's interest in adopting the discriminatory [distinction], no matter how substantial, is simply irrelevant to an inquiry into *the nature of* the two classes receiving inconsistent treatment." *Id.* (emphasis added); *see also Dawson*, 139 S. Ct. at 705; *City of Manassas*, 830 F.2d at 534. Thus, the relevant question, when evaluating whether there are "significant differences" between two groups, is whether the "nature" of

the two groups is significantly different, *Davis*, 489 U.S. at 816, and this Court has *already held* that CDCR and federal immigration detention facilities are *not* different in nature, *see California*, 921 F.3d at 885. A court-ordered population cap is something *completely external* to those facilities; it does not relate to *the nature of* those facilities. Both state and federal facilities can become overcrowded, and federal immigration detention facilities already were even before the COVID-19 pandemic. *See* 3-ER-430 ("It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity."). Under *Dawson*, *Davis*, and other binding precedent, the court-ordered population cap does not differentiate state facilities from federal facilities, and Section 9505(b) therefore unconstitutionally discriminates against the Federal Government.

## II. AB-32 Is Preempted by Federal Immigration Law.

Whereas intergovernmental immunity arises directly from the Supremacy Clause even in the absence of an applicable federal statute, preemption occurs when a state regulation "conflict[s] with an affirmative command of Congress." *North Dakota*, 495 U.S. at 434. State law "actually conflicts" with federal law, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), when it "stands as an obstacle to the accomplishment and execution of congressional objectives," *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). And when deciding whether a state law presents such an obstacle, courts consider "the entire scheme of

the statute," and "that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912). In other words, if the federal law's "operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.*

AB-32 is preempted because it denies to federal immigration statutes their "natural effect[s]" and obviously "frustrate[s]" their operation. *Id.* Put another way, AB-32 and federal immigration law stand in logical contradiction—because "federal law gives an individual the right to engage in certain behavior that state law prohibits," and the laws thus "give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1681 (2019) (Thomas, J., concurring) (quotation omitted).

The applicable statutory scheme gives the Secretary of Homeland Security the right to carry out ICE's detention operations using private contractors. AB-32 directly contradicts that authorization and is therefore preempted.

**A. The Presumption Against Preemption Does Not Apply.**

Because "[s]tates traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" subject to their jurisdiction, *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

475 (1996) (quotation omitted), this Court is "cautious about conflict preemption where a federal statute is urged to conflict with state law regulations *within the traditional scope of the state's police powers*," *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (emphasis added). Once the Court finds that it is "deal[ing] with an area in which states have traditionally acted," it will then "start with the assumption that a state's historic police powers will not be superseded absent a 'clear and manifest purpose of Congress.' " *Id.* (quoting *Wyeth v. Levine,* 555 U.S. 555 (2009)). But this presumption does not apply when a state purports to regulate in an area with a "history of significant federal presence." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 (9th Cir. 2005); *see also United States v. Locke*, 529 U.S. 89, 99 (2000) (declining to apply the presumption against preemption when the federal interest "has been manifest since the beginning of our Republic").

Congress's "considerable authority over immigration matters" includes the "power to detain aliens in connection with removal." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quotation omitted). Indeed, "*any policy* toward aliens" has, since the Founding, been "exclusively entrusted to the" Federal Government. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added); *see also Arizona v. United States*, 567 U.S. 387, 409–10 (2012). Therefore, "[w]hen the national government by treaty or statute has established rules and regulations touching the

rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land." *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941).

In contrast, the states have no tradition of regulating the conditions of confinement for aliens held in the custody of the Federal Government. When a state enacts any law touching on the field of immigration, whatever "concurrent state power that may exist is restricted to the narrowest of limits," and must be "subordinate to supreme national law." *Id.* at 68. Moreover, unlike a traditional health-and-safety regulation, AB-32 regulates the conduct of federal officials and contractors, not merely private residents or corporations residing in the State. *See supra* Part I.A.

As with the regulation of alien detainees, the Federal Government has a historical and exclusive interest in the legality of its own contracts. The Federal Government has, as "an incident to the general right of sovereignty," inherent authority to "enter into contracts not prohibited by law[] and appropriate to the just exercise of [its] powers." *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 128 (1831) (Story, J.). Indeed, the Federal Government "enjoys the unrestricted power to . . . determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). The legal status and effect of the Federal Government's contracts thus present a "uniquely federal interest[]," and the "obligations to and rights of the

United States under its contracts are governed exclusively by federal law." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). AB-32—as a regulation of the Federal Government's contracting authority—simply does not fall within the "traditional scope of the state's police powers." *Chae*, 593 F.3d at 944.

California's general police power over matters of public health and safety simply does not extend to legislation aimed at federal officials tasked with protecting federal interests in an area of national concern. In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), a group of plaintiffs sued a consulting company under state tort law for allegedly making fraudulent representations to the Food and Drug Administration (FDA). While there was no serious dispute that states traditionally exercise their police powers to regulate fraud *generally*, the Supreme Court refused to apply a presumption against preemption because "[p]olicing fraud *against federal agencies* [was] hardly a field which the States have traditionally occupied." *Id.* at 347 (emphasis added) (quotation marks omitted). Indeed, the Court recognized instead that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.*; *see also Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1205 (9th Cir. 2002)

The same analysis applies here: while states may generally exercise their police powers to promote the health and safety of those residing in the state,

regulating the health and safety of those in federal custody is not a field that they have traditionally occupied. Moreover, because the relationship between removable alien detainees and the Federal Government "originates from, is governed by, and terminates according to federal law," *Buckman*, 531 U.S. at 347, the relationship is inherently federal in character and therefore beyond the states' traditional police powers.

The district court nevertheless believed that this Court's decision in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), supported application of the presumption against preemption. *See* 1-ER-32. That reading of *California* was erroneous. The *California* Court merely observed, as a descriptive matter, that the United States, as appellant there, did not "dispute that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." 921 F.3d at 886. Even if that statement could be read to support application of the presumption to *all* "inmates and detainees," including those in federal custody, it was dicta because whether the presumption applied had no bearing on the decision in *California*. Rather, the Court ultimately held that "neither the provisions of the [Immigration and Nationality Act] . . . nor the contracts themselves, demonstrate[d] *any* intent, let alone 'clear and manifest,' that Congress intended to" displace state law. *Id*. (citations and footnote omitted).

At the very least, in light of the clear guidance from the Supreme Court counseling against application of the presumption here, the district court should have declined to *expand* the scope of *California*'s statement beyond the precise factual context presented there. In particular, the *California* Court was quick to note that the Federal Government there was asked only to "permit inspections and produce data" to assist the State's purported exercise of its police power, *id*. at 885, and that the challenged law did not impermissibly "regulate whether or where an immigration detainee may be confined [or] require that federal detention decisions . . . conform to state law." *Id.* at 885–86. Of course, however, that is precisely what AB-32 does, and because AB-32 regulates the Federal Government's relationship with federal detainees, it falls well beyond any police power recognized by this Court in *California*.

### B. AB-32 Clearly and Manifestly Conflicts with Federal Immigration Law.

Even assuming the presumption against preemption applies here, it is clearly rebutted. "[A] law that regulates an area of traditional state concern can still effect an impermissible regulation of immigration." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 972 (9th Cir. 2017). While "[p]ermissible state regulations" of immigration "mirror federal objectives," *id.*, AB-32 undermines them. It is clearly and manifestly inconsistent with federal immigration law.

The Supreme Court has emphasized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. And the same is true of federal officials' broad discretion when it comes to detaining those aliens designated for removal. Congress has granted the Secretary of Homeland Security broad authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress has also granted the Secretary authority to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through *any means*, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent that such agreements are otherwise precluded by federal law. 28 U.S.C. § 530C(a)(4) (emphasis added).[8]

And the Immigration and Nationality Act (INA) further commands that the Secretary "shall arrange for *appropriate* places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1) (emphasis added).[9] As this Court has already noted, this language alone gives the Secretary

[8] While 28 U.S.C. § 530C(a) refers to "the Attorney General," the authority granted there was transferred to the Secretary in the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, insofar as the authority applied to immigration enforcement. *See* 6 U.S.C. §§ 202(3), 251(2); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005); *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019).

[9] As with Section 530C, although the text of 8 U.S.C. § 1231(g) refers to "[t]he Attorney General," the Homeland Security Act of 2002 transferred that authority to the Secretary. *See* 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 557.

"broad discretion in exercising his authority to choose the place of detention for deportable aliens." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir.), *amended*, 807 F.2d 769 (9th Cir. 1986). Particularly telling is the use of the word "appropriate" in Section 1231(g), "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quotation omitted).

Perhaps even more telling, in 2000 Congress enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, *including related services, on any reasonable basis*." 18 U.S.C. § 4013 note "Contracts for Space or Facilities" (emphasis added).

Between these four statutes—each of which use broad terms like "appropriate," "necessary and proper," "reasonable discretion," "any reasonable basis," and "any means"—Congress has made perfectly clear and manifest its intention that the Secretary exercise his own independent judgment regarding which detention arrangements best advance the public interest. And it clearly did *not* intend that the "appropriateness," "necessity," "propriety," or "reasonableness" of those contracting decisions should turn on preferences of individual states. "When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and

determine how best to prioritize those objectives. Allowing a state law to impose a different standard [impermissibly] permits a re-balancing of those objectives." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 849 (9th Cir. 2019) (quotation omitted) (alteration in *CTIA*).

Consistent with this principle, the Supreme Court has prohibited states from cabining the congressionally delegated discretion of federal officials. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 (2000) (holding that when Congress "clearly intended [a] federal Act to provide the President with flexible and effective authority," state law intruding on that authority is preempted); *see also, e.g.*, *Buckman*, 531 U.S. at 348; *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000). AB-32 impermissibly undermines the substantial discretion Congress granted to the Secretary in the statutory provisions cataloged above. As in *Crosby*, it is "implausible" that Congress "would have gone to such lengths to empower" the Secretary with such broad discretion in housing detained aliens awaiting removal proceedings and entering into contracts to carry out ICE's functions while at the same time "compromis[ing] his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of [his] discretionary . . . action." 530 U.S. at 376. Moreover, even *Crosby* did not confront the sort of obstacle posed by AB-32. The state law here does not merely "blunt the consequences" of the Secretary's exercise of discretion; it narrows his

sphere of discretion and effectively *prohibits* him from taking actions authorized by the federal statutes.

The district court fundamentally misunderstood the import of the precedents discussed above. Rather than assessing whether AB-32 conflicted with Congress's clear intent *to empower the Secretary with discretion* over how the Federal Government should detain aliens, the court below instead asked whether AB-32 conflicted with some "clear and manifest congressional objective *that ICE contract with private detention facilities* to house immigration detainees." 1-ER-35 (emphasis added). And because none of the statutes above specifically state that the Secretary's broad discretion extends to contracting with private detention operators, the court concluded that AB-32 was not preempted.

Although the district court conceded that the broad language of the statutes invoked by GEO "could conceivably encompass the authority to make contracts with private detention companies," 1-ER-36–37, the court nonetheless refused to recognize that Congress's clear delegation of expansive discretion sufficed to preempt AB-32. In so holding, the district court seemingly called into question whether federal immigration law authorizes the Secretary to contract with private detention facilities *at all*. That doubt was completely unjustified given expansive breadth of contracting discretion delegated to the Secretary through the various statutes listed above.

Once one recognizes that the Secretary has congressionally delegated authority to contract with private detention facilities, it follows that AB-32 is preempted. "[N]ormally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)). Conflict between state and federal law "does not evaporate" merely because the federal law "simply permits, but does not compel," federal instrumentalities to take certain acts. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982).

For example, in *United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir. 1981), this Court found a "clear" conflict between federal and local law where the local ordinance prohibited postal carriers from crossing lawns without first obtaining the owner's express consent, even as federal law authorized postal carriers to cross such lawns unless the owner objected. *Id.* at 785. Because the ordinance interfered with the postal carriers' federal duties to deliver mail efficiently, it was preempted. *Id.* at 786. The same is true of AB-32: it clearly and manifestly conflicts with federal immigration law because it necessarily restricts the otherwise broad discretion Congress delegated to the Secretary for housing detained aliens within the United States.

But AB-32 also conflicts with the broader federal policies and priorities expressed in the INA. Most significantly, the INA instructs the Director of ICE,[10] "[p]rior to initiating any project for the construction of any new detention facility," to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2). In other words, under the INA, building new federally owned immigration detention facilities should be a last resort, not to be undertaken when suitable private facilities are available for lease.

AB-32—working in tandem with California's other regulatory statutes—essentially makes it all but impossible for the Secretary to avoid this last resort. After the passage of AB-103 and SB-29, cities, counties, and other localities in California are largely forbidden from housing federal alien detainees within their jurisdictions. *See supra* Background Part I.C. Worse still, ICE has already explained that the last resort available to it in California—building or purchasing, and consequently operating, its own facilities—"is not a practical or legal possibility." 2-ER-219.

By prohibiting private detention altogether, AB-32 effectively requires the Secretary to transfer aliens out of California. *See* 2-ER-225. In no conceivable world would Congress have delegated broad authority to the Secretary to arrange for

---

[10] The statute identifies the Commissioner of the Immigration and Naturalization Services, but his functions have been transferred to the Director of ICE. *See* 6 U.S.C. § 557.

"appropriate places of detention," 8 U.S.C. § 1231(g)(1), only to have the states reduce him to choosing between only two options that he deems manifestly *inappropriate*. And while Congress recognized a variety of potentially "appropriate" arrangements for housing aliens pending removal, it explicitly disfavored one of the two options left to the Secretary after AB-32—building or purchasing new facilities.

Finally, the district court's preemption holding violated the well-settled principle that "any state law that impedes the federal government's ability to contract . . . [is] preempted." *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018); *see Sperry v. Florida*, 373 U.S. 379, 385 (1963); *Leslie Miller, Inc.*, 352 U.S. at 190; *Virginia*, 139 F.3d at 987–88. For example, in *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991), this Court held—consistent with longstanding Supreme Court precedent—that California's attempt to regulate contractors performing services on a federal construction project was preempted. *Id.* at 438–41. While the Federal Government had concluded that the contractor in *Gartrell* satisfied the requirements for "responsibility" dictated by the Federal Acquisition Regulations, California imposed a parallel licensing regime that "effectively attempt[ed] to review the federal government's responsibility determination." *Id.* 439. Such second-guessing of the Federal Government's contracting choices "interfere[s] with federal government functions and would frustrate the federal policy." *Id.* at 441.

This Court's analysis in *Gartrell* applies with full force to AB-32: federal law requires the Secretary to arrange for "appropriate" places of detention for aliens detained pending removal and authorizes him to contract with private detention facilities to carry out this function. But AB-32 categorically *prohibits* of the use of private detention facilities that the Secretary deems "appropriate" and thus constitutes precisely the kind of second-guessing that is preempted under *Gartrell*.

No matter how one characterizes AB-32—as a limitation on the Secretary's congressionally delegated discretion, or as an interference with the Federal Government's ability to contract with private entities whose facilities it deems "appropriate" under the INA, or both—it is an impermissible obstacle to federal immigration law and is therefore preempted.

## III. In the Alternative, the State May Not Enforce AB-32 Against GEO's ICE Facilities Before 2034 Under AB-32's Temporary Safe Harbor.

The district court also erred in denying GEO partial relief by declaring that AB-32's temporary safe-harbor provision protects GEO's facilities through the end of their contractual terms and enjoining Defendants from attempting to shut down GEO's facilities until the contracts terminate. As noted earlier, Section 9505(a) of AB-32 states:

> Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that

> was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

CAL. PENAL CODE § 9505(a).

GEO's ICE detention facilities are currently operating within this temporary safe harbor. GEO signed new contracts with ICE on December 19, 2019, with an effective date of December 20, 2019. These contracts, covering all five of GEO's ICE detention facilities—Adelanto, Desert View (as an annex to Adelanto), Mesa Verde, Central Valley (as an annex to Mesa Verde), and Golden State (also as an annex to Mesa Verde)—were therefore "in effect before January 1, 2020." *Id.* Because GEO's new ICE contracts have a full contract term ending on December 19, 2034, these facilities are protected under AB-32's temporary safe harbor through that date.

The State below did not even contest this point, instead conceding that "[i]f [GEO]'s factual allegations are true (including the terms and validity of its contracts), then all of its contracts fall within [Section 9505(a)]." 2-ER-113. The undisputed evidence in the record demonstrated that GEO's factual allegations were indeed true: GEO's ICE contracts expressly state that the "Period of Performance" is "12/20/2019 to 12/19/2034" and that that period is their "total duration." 2-ER-335; 2-ER-350. The fact that ICE has the option of terminating the contracts early every five years, with the first such option occurring on December 20, 2024,

does not change the fact that the contracts' own terms make clear that their base period of performance is fifteen years.

And yet, without a shred of legal analysis, the district court asserted that "[i]t appear[ed] unlikely that GEO will succeed in arguing" that the Federal Government's termination options were not "extensions" prohibited by AB-32. 1-ER-73. That conclusory statement—unsupported by any evidence or legal authority—was erroneous. The court had no basis for denying GEO partial relief under AB-32's temporary safe harbor, especially in light of the State's failure to challenge GEO's characterization of its own contract.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order insofar as it denied GEO's motion for a preliminary injunction and dismissed GEO's intergovernmental-immunity and preemption claims, and remand with instructions for the district court to preliminarily or permanently enjoin enforcement of AB-32 against privately operated ICE facilities in California.[11] In the alternative, the Court

[11] Because GEO has shown a "100% probability of success on the merits" due to the legal nature of its claims, and "[n]o facts which might be adduced at a trial w[ould] change this result," the Court should remand with instructions for the district court to enter *permanent* injunctive relief. *See Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir. 1998), *abrogated on other grounds*, *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

should at least reverse the district court's denial of a preliminary injunction as to GEO's claim under AB-32's temporary safe harbor, and remand with instructions for the district court to enjoin Defendants from enforcing AB-32 against GEO's ICE facilities until December 19, 2034.

Dated: December 22, 2020

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
Michael W. Kirk
Steven J. Lindsay
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com

Michael B. McClellan
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA 92660
(949) 854-7000
michael.mcclellan@ndlf.com

Michael W. Battin
NAVIGATO & BATTIN, LLP
755 West A Street, Suite 150
San Diego, CA 92101
(619) 233-5365
mike@navbat.com

*Attorneys for Plaintiff-Appellant The GEO Group, Inc.*

**STATEMENT OF RELATED CASES**

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellant The GEO Group, Inc. states that *United States v. Newsom*, No. 20-56304, is a related case pending in this Court.

Dated: December 22, 2020

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiff-Appellant*
*The GEO Group, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume requirements of Circuit Rule 32-1(a) because it contains 13,999 words, excluding the parts of the brief exempted by Circuit Rule 32-1(c) and FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: December 22, 2020

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiff-Appellant*
*The GEO Group, Inc.*

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

**Page**

U.S. CONST. art. VI, cl. 2 .......... A1

6 U.S.C.

§ 112 .......... A2

§ 202 .......... A8

§ 251 .......... A10

§ 557 .......... A11

8 U.S.C.

§ 1103 .......... A12

§ 1225 .......... A20

§ 1226 .......... A34

§ 1231 .......... A38

18 U.S.C. § 4013 .......... A65

28 U.S.C.

§ 530C .......... A74

§ 2671 .......... A87

CAL. CIV. CODE § 1670.9 (SB-29) .......... A88

CAL. GOV'T CODE § 7310 (AB-103) .......... A90

CAL. PENAL CODE (AB-32)

§ 5003.1 ........................................................................................A91

§ 9500 ........................................................................................A92

§ 9501 ........................................................................................A93

§ 9502 ........................................................................................A94

§ 9503 ........................................................................................A96

§ 9505 ........................................................................................A97

**U.S. CONST. art. VI, cl. 2**

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**6 U.S.C. § 112**

**(a) Secretary**

**(1) In general**

There is a Secretary of Homeland Security, appointed by the President, by and with the advice and consent of the Senate.

**(2) Head of Department**

The Secretary is the head of the Department and shall have direction, authority, and control over it.

**(3) Functions vested in Secretary**

All functions of all officers, employees, and organizational units of the Department are vested in the Secretary.

**(b) Functions**

The Secretary—

(1) except as otherwise provided by this chapter, may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department;

(2) shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law; and

(3) shall take reasonable steps to ensure that information systems and databases of the Department are compatible with each other and with appropriate databases of other Departments.

**(c) Coordination with non-Federal entities**

With respect to homeland security, the Secretary shall coordinate through the Office of State and Local Coordination (established under section 361 of this title) (including the provision of training and equipment) with State and local government personnel, agencies, and authorities, with the private sector, and with other entities, including by—

(1) coordinating with State and local government personnel, agencies, and authorities, and with the private sector, to ensure adequate planning, equipment, training, and exercise activities;

(2) coordinating and, as appropriate, consolidating, the Federal Government's communications and systems of communications relating to homeland security with State and local government personnel, agencies, and authorities, the private sector, other entities, and the public; and

(3) distributing or, as appropriate, coordinating the distribution of, warnings and information to State and local government personnel, agencies, and authorities and to the public.

**(d) Meetings of National Security Council**

The Secretary may, subject to the direction of the President, attend and participate in meetings of the National Security Council.

**(e) Issuance of regulations**

The issuance of regulations by the Secretary shall be governed by the provisions of chapter 5 of title 5, except as specifically provided in this chapter, in laws granting regulatory authorities that are transferred by this chapter, and in laws enacted after November 25, 2002.

**(f) Special Assistant to the Secretary**

The Secretary shall appoint a Special Assistant to the Secretary who shall be responsible for—

(1) creating and fostering strategic communications with the private sector to enhance the primary mission of the Department to protect the American homeland;

(2) advising the Secretary on the impact of the Department's policies, regulations, processes, and actions on the private sector;

(3) interfacing with other relevant Federal agencies with homeland security missions to assess the impact of these agencies' actions on the private sector;

(4) creating and managing private sector advisory councils composed of representatives of industries and associations designated by the Secretary to—

(A) advise the Secretary on private sector products, applications, and solutions as they relate to homeland security challenges;

(B) advise the Secretary on homeland security policies, regulations, processes, and actions that affect the participating industries and associations; and

(C) advise the Secretary on private sector preparedness issues, including effective methods for—

(i) promoting voluntary preparedness standards to the private sector; and

(ii) assisting the private sector in adopting voluntary preparedness standards;

(5) working with Federal laboratories, federally funded research and development centers, other federally funded organizations, academia, and the private sector to develop innovative approaches to address homeland security challenges to produce and deploy the best available technologies for homeland security missions;

(6) promoting existing public-private partnerships and developing new public-private partnerships to provide for collaboration and mutual support to address homeland security challenges;

(7) assisting in the development and promotion of private sector best practices to secure critical infrastructure;

(8) providing information to the private sector regarding voluntary preparedness standards and the business justification for preparedness and promoting to the private sector the adoption of voluntary preparedness standards;

(9) coordinating industry efforts, with respect to functions of the Department of Homeland Security, to identify private sector resources and capabilities that could be effective in supplementing Federal, State, and local government agency efforts to prevent or respond to a terrorist attack;

(10) coordinating with the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for Trade Development of the Department of Commerce on issues related to the travel and tourism industries; and

(11) consulting with the Office of State and Local Government Coordination and Preparedness on all matters of concern to the private sector, including the tourism industry.

**(g) Standards policy**

All standards activities of the Department shall be conducted in accordance with section 12(d) of the National Technology Transfer Advancement Act of 1995 (15 U.S.C. 272 note) and Office of Management and Budget Circular A–119.

**6 U.S.C. § 202**

The Secretary [of Homeland Security] shall be responsible for the following:

(1) Preventing the entry of terrorists and the instruments of terrorism into the United States.

(2) Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

(3) Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.

(4) Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

(5) Establishing national immigration enforcement policies and priorities.

(6) Except as provided in part C of this subchapter, administering the customs laws of the United States.

(7) Conducting the inspection and related administrative functions of the Department of Agriculture transferred to the Secretary of Homeland Security under section 231 of this title.

(8) In carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce.

**6 U.S.C. § 251**

In accordance with subchapter XII (relating to transition provisions), there shall be transferred from the Commissioner of Immigration and Naturalization to the Secretary [of Homeland Security] all functions performed under the following programs, and all personnel, assets, and liabilities pertaining to such programs, immediately before such transfer occurs:

(1) The Border Patrol program.

(2) The detention and removal program.

(3) The intelligence program.

(4) The investigations program.

(5) The inspections program.

**6 U.S.C. § 557**

With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

**8 U.S.C. § 1103**

**(a) Secretary of Homeland Security**

(1) The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2) He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3) He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4) He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers,

privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5) He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

(6) He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(7) He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(8) After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring

that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

(9) Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

(10) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(11) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of title 40.

(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

(1) The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

(3) Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

(1) The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

(2) Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

**8 U.S.C. § 1225**

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

**(2) Stowaways**

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.

**(3) Inspection**

All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

**(4) Withdrawal of application for admission**

An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

**(5) Statements**

An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

**(iii) Application to certain other aliens**

**(I) In general**

The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**

An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

**(B) Asylum interviews**

**(i) Conduct by asylum officers**

An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of

entry or at such other place designated by the Attorney General.

**(ii) Referral of certain aliens**

If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

**(iii) Removal without further review if no credible fear of persecution**

**(I) In general**

Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

**(II) Record of determination**

The officer shall prepare a written record of a determination under subclause (I). Such record shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied

upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. A copy of the officer's interview notes shall be attached to the written summary.

**(III) Review of determination**

The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I).

**(IV) Mandatory detention**

Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

**(iv) Information about interviews**

The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.

**(v) "Credible fear of persecution" defined**

For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that

the alien could establish eligibility for asylum under section 1158 of this title.

**(C) Limitation on administrative review**

Except as provided in subparagraph (B)(iii)(III), a removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 1157 of this title, or to have been granted asylum under section 1158 of this title.

**(D) Limit on collateral attacks**

In any action brought against an alien under section 1325(a) of this title or section 1326 of this title, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii).

**(E) "Asylum officer" defined**

As used in this paragraph, the term "asylum officer" means an immigration officer who—

(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title, and

(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

**(F) Exception**

Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry.

**(G) Commonwealth of the Northern Mariana Islands**

Nothing in this subsection shall be construed to authorize or require any person described in section 1158(e) of this title to be permitted to apply for asylum under section 1158 of this title at any time before January 1, 2014.

**(2) Inspection of other aliens**

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien—

(i) who is a crewman,

(ii) to whom paragraph (1) applies, or

(iii) who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

**(3) Challenge of decision**

The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 1229a of this title.

**(c) Removal of aliens inadmissible on security and related grounds**

**(1) Removal without further hearing**

If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 1182(a)(3) of this title, the officer or judge shall—

(A) order the alien removed, subject to review under paragraph (2);

(B) report the order of removal to the Attorney General; and

(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

**(2) Review of order**

(A) The Attorney General shall review orders issued under paragraph (1).

(B) If the Attorney General—

(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 1182(a)(3) of this title, and

(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

**(3) Submission of statement and information**

The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

**(d) Authority relating to inspections**

**(1) Authority to search conveyances**

Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

**(2) Authority to order detention and delivery of arriving aliens**

Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

(A) to detain the alien on the vessel or at the airport of arrival, and

(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

**(3) Administration of oath and consideration of evidence**

The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service.

**(4) Subpoena authority**

(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States.

(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

**8 U.S.C. § 1226**

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

**(b) Revocation of bond or parole**

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

**(c) Detention of criminal aliens**

**(1) Custody**

The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

**(2) Release**

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide

protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**(d) Identification of criminal aliens**

(1) The Attorney General shall devise and implement a system—

(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

(2) The record under paragraph (1)(C) shall be made available—

(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

(B) to officials of the Department of State for use in its automated visa lookout system.

(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

**(e) Judicial review**

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

**8 U.S.C. § 1231**

**(a) Detention, release, and removal of aliens ordered removed**

**(1) Removal period**

**(A) In general**

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

**(B) Beginning of period**

The removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

**(C) Suspension of period**

The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

**(2) Detention**

During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

**(3) Supervision after 90-day period**

If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

(A) to appear before an immigration officer periodically for identification;

(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

**(4) Aliens imprisoned, arrested, or on parole, supervised release, or probation**

**(A) In general**

Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment—

(i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or

(ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**(5) Reinstatement of removal orders against aliens illegally reentering**

If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

**(6) Inadmissible or criminal aliens**

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

**(7) Employment authorization**

No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

**(b) Countries to which aliens may be removed**

**(1) Aliens arriving at the United States**

Subject to paragraph (3)—

**(A) In general**

Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 1229a of this title were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

**(B) Travel from contiguous territory**

If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

**(C) Alternative countries**

If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

(i) The country of which the alien is a citizen, subject, or national.

(ii) The country in which the alien was born.

(iii) The country in which the alien has a residence.

(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

**(2) Other aliens**

Subject to paragraph (3)—

**(A) Selection of country by alien**

Except as otherwise provided in this paragraph—

(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

(ii) the Attorney General shall remove the alien to the country the alien so designates.

**(B) Limitation on designation**

An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or

an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

**(C) Disregarding designation**

The Attorney General may disregard a designation under subparagraph (A)(i) if—

(i) the alien fails to designate a country promptly;

(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

(iii) the government of the country is not willing to accept the alien into the country; or

(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

**(D) Alternative country**

If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien

to a country of which the alien is a subject, national, or citizen unless the government of the country—

(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

(ii) is not willing to accept the alien into the country.

**(E) Additional removal countries**

If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

(i) The country from which the alien was admitted to the United States.

(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

(iv) The country in which the alien was born.

(v) The country that had sovereignty over the alien's birthplace when the alien was born.

(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

**(F) Removal country when United States is at war**

When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or

a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

**(3) Restriction on removal to a country where alien's life or freedom would be threatened**

**(A) In general**

Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

**(B) Exception**

Subparagraph (A) does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that—

(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of

the individual's race, religion, nationality, membership in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 1227(a)(4)(B) of this title shall be considered to be an alien with respect to whom there are

reasonable grounds for regarding as a danger to the security of the United States.

**(C) Sustaining burden of proof; credibility determinations**

In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B) of this title.

**(c) Removal of aliens arriving at port of entry**

**(1) Vessels and aircraft**

An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 1225(b)(1) or 1225(c) of this title or pursuant to proceedings under section 1229a of this title initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

(B) the alien is a stowaway—

(i) who has been ordered removed in accordance with section 1225(a)(1) of this title,

(ii) who has requested asylum, and

(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

**(2) Stay of removal**

**(A) In general**

The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

(i) immediate removal is not practicable or proper; or

(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

**(B) Payment of detention costs**

During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation "Immigration and Naturalization Service—Salaries and Expenses"—

(i) the cost of maintenance of the alien; and

(ii) a witness fee of $1 a day.

**(C) Release during stay**

The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

(ii) condition that the alien appear when required as a witness and for removal; and

(iii) other conditions the Attorney General may prescribe.

**(3) Costs of detention and maintenance pending removal**

**(A) In general**

Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

**(i)** while the alien is detained under subsection (d)(1), and

(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

(I) subsection (d)(2)(A) or (d)(2)(B)(i),

(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including

obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

(III) section 1225(b)(1)(B)(ii) of this title, for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

**(B) Nonapplication**

Subparagraph (A) shall not apply if—

(i) the alien is a crewmember;

(ii) the alien has an immigrant visa;

(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than

120 days after the date the visa or documentation was issued;

(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

(v)

(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

(vi) the individual claims to be a national of the United States and has a United States passport.

**(d) Requirements of persons providing transportation**

**(1) Removal at time of arrival**

An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

(B) take the alien to the foreign country to which the alien is ordered removed.

**(2) Alien stowaways**

An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

(i) for medical treatment,

(ii) for detention of the stowaway by the Attorney General, or

(iii) for departure or removal of the stowaway; and

(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if the requester has obtained any travel documents necessary for departure or repatriation of the stowaway and removal of the stowaway will not be unreasonably delayed.

**(3) Removal upon order**

An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this chapter.

**(e) Payment of expenses of removal**

**(1) Costs of removal at time of arrival**

In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 1225(a)(1) or 1225(c) of this title or pursuant to proceedings under section 1229a of this title initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

(A) pay the cost from the appropriation "Immigration and Naturalization Service—Salaries and Expenses"; and

(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

**(2) Costs of removal to port of removal for aliens admitted or permitted to land**

In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this chapter.

**(3) Costs of removal from port of removal for aliens admitted or permitted to land**

**(A) Through appropriation**

Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this chapter.

**(B) Through owner**

**(i) In general**

In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

**(ii) Aliens described**

An alien described in this clause is an alien who—

(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission

based on a ground that existed before or at the time of admission, or

(II) is an alien crewman permitted to land temporarily under section 1282 of this title and is ordered removed within 5 years of the date of landing.

**(C) Costs of removal of certain aliens granted voluntary departure**

In the case of an alien who has been granted voluntary departure under section 1229c of this title and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this chapter.

**(f) Aliens requiring personal care during removal**

**(1) In general**

If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

**(2) Costs**

The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

**(g) Places of detention**

**(1) In general**

The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service—Salaries and Expenses", without regard to section 6101 of title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

**(2) Detention facilities of the Immigration and Naturalization Service**

Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability

for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

**(h) Statutory construction**

Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

**(i) Incarceration**

(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

(3) For purposes of this subsection, the term "undocumented criminal alien" means an alien who—

(A) has been convicted of a felony or two or more misdemeanors; and

(B)

(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status.

(4)

(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

(5) There are authorized to be appropriated to carry out this subsection—

(A) $750,000,000 for fiscal year 2006;

(B) $850,000,000 for fiscal year 2007; and

(C) $950,000,000 for each of the fiscal years 2008 through 2011.

(6) Amounts appropriated pursuant to the authorization of appropriations in paragraph (5) that are distributed to a State or political subdivision of a State, including a municipality, may be used only for correctional purposes.

**18 U.S.C. § 4013**

(a) The Attorney General, in support of United States prisoners in non-Federal institutions, is authorized to make payments from funds appropriated for Federal prisoner detention for—

(1) necessary clothing;

(2) medical care and necessary guard hire; and

(3) the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities.

(b) The Attorney General, in support of Federal prisoner detainees in non-Federal institutions, is authorized to make payments, from funds appropriated for State and local law enforcement assistance, for entering into contracts or cooperative agreements with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services in any State or local jurisdiction which agrees to provide guaranteed bed space for Federal detainees within that correctional system, in accordance with regulations which are issued by the Attorney General and are comparable to the regulations issued under section 4006 of this title, except that—

(1) amounts made available for purposes of this paragraph shall not exceed the average per-inmate cost of constructing similar confinement facilities for the Federal prison population,

(2) the availability of such federally assisted facility shall be assured for housing Federal prisoners, and

(3) the per diem rate charged for housing such Federal prisoners shall not exceed allowable costs or other conditions specified in the contract or cooperative agreement.

(c)

(1) The United States Marshals Service may designate districts that need additional support from private detention entities under subsection (a)(3) based on—

(A) the number of Federal detainees in the district; and

(B) the availability of appropriate Federal, State, and local government detention facilities.

(2) In order to be eligible for a contract for the housing, care, and security of persons held in custody of the United States Marshals pursuant to Federal law and funding under subsection (a)(3), a private entity shall—

(A) be located in a district that has been designated as needing additional Federal detention facilities pursuant to paragraph (1);

(B) meet the standards of the American Correctional Association;

(C) comply with all applicable State and local laws and regulations;

(D) have approved fire, security, escape, and riot plans; and

(E) comply with any other regulations that the Marshals Service deems appropriate.

(3) The United States Marshals Service shall provide an opportunity for public comment on a contract under subsection (a)(3).

**(d) Health Care Fees For Federal Prisoners in Non-Federal Institutions.—**

(1) In general.—Notwithstanding amounts paid under subsection (a)(3), a State or local government may assess and collect a reasonable fee from the trust fund account (or institutional equivalent) of a Federal prisoner for health care services, if—

(A) the prisoner is confined in a non-Federal institution pursuant to an agreement between the Federal Government and the State or local government;

(B) the fee—

(i) is authorized under State law; and

(ii) does not exceed the amount collected from State or local prisoners for the same services; and

(C) the services—

(i) are provided within or outside of the institution by a person who is licensed or certified under State law to provide health care services and who is operating within the scope of such license;

(ii) constitute a health care visit within the meaning of section 4048(a)(4) of this title; and

(iii) are not preventative health care services, emergency services, prenatal care, diagnosis or treatment of chronic infectious diseases, mental health care, or substance abuse treatment.

**(2) No refusal of treatment for financial reasons.—**

Nothing in this subsection may be construed to permit any refusal of treatment to a prisoner on the basis that—

(A) the account of the prisoner is insolvent; or

(B) the prisoner is otherwise unable to pay a fee assessed under this subsection.

**(3) Notice to prisoners of law.—**

Each person who is or becomes a prisoner shall be provided with written and oral notices of the provisions of this subsection and the applicability of this subsection to the prisoner. Notwithstanding any

other provision of this subsection, a fee under this section may not be assessed against, or collected from, such person—

(A) until the expiration of the 30-day period beginning on the date on which each prisoner in the prison system is provided with such notices; and

(B) for services provided before the expiration of such period.

**(4) Notice to prisoners of state or local implementation.—**

The implementation of this subsection by the State or local government, and any amendment to that implementation, shall not take effect until the expiration of the 30-day period beginning on the date on which each prisoner in the prison system is provided with written and oral notices of the provisions of that implementation (or amendment, as the case may be). A fee under this subsection may not be assessed against, or collected from, a prisoner pursuant to such implementation (or amendments, as the case may be) for services provided before the expiration of such period.

**(5) Notice before public comment period.—**

Before the beginning of any period a proposed implementation under this subsection is open to public comment, written and oral notice of the provisions of that proposed implementation shall be provided to

groups that advocate on behalf of Federal prisoners and to each prisoner subject to such proposed implementation.

**(6) Comprehensive HIV/AIDS services required.—**

Any State or local government assessing or collecting a fee under this subsection shall provide comprehensive coverage for services relating to human immunodeficiency virus (HIV) and acquired immune deficiency syndrome (AIDS) to each Federal prisoner in the custody of such State or local government when medically appropriate. The State or local government may not assess or collect a fee under this subsection for providing such coverage.

## NOTES

**Amendments**

2002—Subsec. (a). Pub. L. 107–273, § 302(2)(A), in introductory provisions, substituted "Federal prisoner detention" for "the support of United States prisoners", inserted "and" at end of par. (2), substituted period for "; and" at end of par. (3), and in introductory provisions of par. (4), inserted "The Attorney General, in support of Federal prisoner detainees in non-Federal institutions, is authorized to make payments, from funds appropriated for State and local law enforcement assistance, for" before "entering". Subsecs. (a)(4), (b). Pub. L. 107–273, § 302(2)(B)(ii), redesignated par. (4) of subsec. (a) as subsec. (b) and subpars. (A) to (C) as pars. (1)

to (3), respectively. Former subsec. (b) redesignated (c). Subsecs. (c), (d). Pub. L. 107–273, § 302(2)(B)(i), redesignated subsecs. (b) and (c) as (c) and (d), respectively. 2000—Subsec. (c). Pub. L. 106–294 added subsec. (c). 1994—Pub. L. 103–322, § 330011(o), repealed Pub. L. 101–647, § 3599. See 1990 Amendment note below. 1990—Subsec. (a). Pub. L. 101–647, § 3599, which struck out "(a)" at beginning of text, was repealed by Pub. L. 103–322, § 330011(o). Subsec. (b). Pub. L. 101–647, § 1701, added subsec. (b).

**Effective Date of 1994 Amendment**

Pub. L. 103–322, title XXXIII, § 330011(o), Sept. 13, 1994, 108 Stat. 2145, provided that the amendment made by section 330011(o) is effective Nov. 29, 1990.

**Contracts for Space or Facilities**

Pub. L. 106–553, § 1(a)(2) [title I, § 118, formerly § 119], Dec. 21, 2000, 114 Stat. 2762, 2762A–69; renumbered § 118, Pub. L. 106–554, § 1(a)(4) [div. A, § 213(a)(2)], Dec. 21, 2000, 114 Stat. 2763, 2763A–179, provided that: "Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 ([former] 41 U.S.C. 353(d)) [now 41 U.S.C. 6707(d)], the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."

**Justice Prisoner and Alien Transportation System Fund, United States Marshals Service**

Pub. L. 106–553, § 1(a)(2) [title I], Dec. 21, 2000, 114 Stat. 2762, 2762A–55, provided in part that: "Beginning in fiscal year 2000 and thereafter, payment shall be made from the Justice Prisoner and Alien Transportation System Fund for necessary expenses related to the scheduling and transportation of United States prisoners and illegal and criminal aliens in the custody of the United States Marshals Service, as authorized in 18 U.S.C. 4013, including, without limitation, salaries and expenses, operations, and the acquisition, lease, and maintenance of aircraft and support facilities: Provided, That the Fund shall be reimbursed or credited with advance payments from amounts available to the Department of Justice, other Federal agencies, and other sources at rates that will recover the expenses of Fund operations, including, without limitation, accrual of annual leave and depreciation of plant and equipment of the Fund: Provided further, That proceeds from the disposal of Fund aircraft shall be credited to the Fund: Provided further, That amounts in the Fund shall be available without fiscal year limitation, and may be used for operating equipment lease agreements that do not exceed 10 years." Similar provisions were contained in the following prior appropriations act: Pub. L. 106–113, div. B, § 1000(a)(1) [title I], Nov. 29, 1999, 113 Stat. 1535, 1501A–7. Pub. L. 105–277, div. A, § 101(b) [title I], Oct. 21, 1998, 112 Stat. 2681–50, 2681–54,

provided that: "There is hereby established a Justice Prisoner and Alien Transportation System Fund for the payment of necessary expenses related to the scheduling and transportation of United States prisoners and illegal and criminal aliens in the custody of the United States Marshals Service, as authorized in 18 U.S.C. 4013, including, without limitation, salaries and expenses, operations, and the acquisition, lease, and maintenance of aircraft and support facilities: Provided, That the Fund shall be reimbursed or credited with advance payments from amounts available to the Department of Justice, other Federal agencies, and other sources at rates that will recover the expenses of Fund operations, including, without limitation, accrual of annual leave and depreciation of plant and equipment of the Fund: Provided further, That proceeds from the disposal of Fund aircraft shall be credited to the Fund: Provided further, That amounts in the Fund shall be available without fiscal year limitation, and may be used for operating equipment lease agreements that do not exceed 5 years."

**28 U.S.C. § 530C**

**(a) In General.**—Except to the extent provided otherwise by law, the activities of the Department of Justice (including any bureau, office, board, division, commission, subdivision, unit, or other component thereof) may, in the reasonable discretion of the Attorney General, be carried out through any means, including—

(1) through the Department's own personnel, acting within, from, or through the Department itself;

(2) by sending or receiving details of personnel to other branches or agencies of the Federal Government, on a reimbursable, partially-reimbursable, or nonreimbursable basis;

(3) through reimbursable agreements with other Federal agencies for work, materials, or equipment;

(4) through contracts, grants, or cooperative agreements with non-Federal parties; and

(5) as provided in subsection (b), in section 524, and in any other provision of law consistent herewith, including, without limitation, section 102(b) of Public Law 102–395 (106 Stat. 1838), as incorporated by section 815(d) of Public Law 104–132 (110 Stat. 1315).

**(b) Permitted Uses.**—

(1) **General permitted uses.—**Funds available to the Attorney General (i.e., all funds available to carry out the activities described in subsection (a)) may be used, without limitation, for the following:

(A) The purchase, lease, maintenance, and operation of passenger motor vehicles, or police-type motor vehicles for law enforcement purposes, without regard to general purchase price limitation for the then-current fiscal year.

(B) The purchase of insurance for motor vehicles, boats, and aircraft operated in official Government business in foreign countries.

(C) Services of experts and consultants, including private counsel, as authorized by section 3109 of title 5, and at rates of pay for individuals not to exceed the maximum daily rate payable from time to time under section 5332 of title 5.

(D) Official reception and representation expenses (i.e., official expenses of a social nature intended in whole or in predominant part to promote goodwill toward the Department or its missions, but excluding expenses of public tours of facilities of the Department of Justice), in accordance with distributions and procedures established, and rules issued, by the Attorney

General, and expenses of public tours of facilities of the Department of Justice.

(E) Unforeseen emergencies of a confidential character, to be expended under the direction of the Attorney General and accounted for solely on the certificate of the Attorney General.

(F) Miscellaneous and emergency expenses authorized or approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or the Assistant Attorney General for Administration.

(G) In accordance with procedures established and rules issued by the Attorney General—

(i) attendance at meetings and seminars;

(ii) conferences and training; and

(iii) advances of public moneys under section 3324 of title 31: Provided, That travel advances of such moneys to law enforcement personnel engaged in undercover activity shall be considered to be public money for purposes of section 3527 of title 31.

(H) Contracting with individuals for personal services abroad, except that such individuals shall not be regarded as employees of the

United States for the purpose of any law administered by the Office of Personnel Management.

(I) Payment of interpreters and translators who are not citizens of the United States, in accordance with procedures established and rules issued by the Attorney General.

(J) Expenses or allowances for uniforms as authorized by section 5901 of title 5, but without regard to the general purchase price limitation for the then-current fiscal year.

(K) Expenses of—

(i) primary and secondary schooling for dependents of personnel stationed outside the United States at cost not in excess of those authorized by the Department of Defense for the same area, when it is determined by the Attorney General that schools available in the locality are unable to provide adequately for the education of such dependents; and

(ii) transportation of those dependents between their place of residence and schools serving the area which those dependents would normally attend when the Attorney General, under such regulations as he may prescribe,

determines that such schools are not accessible by public means of transportation.

(L) payment of rewards (i.e., payments pursuant to public advertisements for assistance to the Department of Justice), in accordance with procedures and regulations established or issued by the Attorney General: Provided, That—

(i) no such reward shall exceed $3,000,000, unless—

(I) the reward is to combat domestic terrorism or international terrorism (as defined in section 2331 of title 18); or

(II) a statute should authorize a higher amount;

(ii) no such reward of $250,000 or more may be made or offered without the personal approval of either the Attorney General or the President;

(iii) the Attorney General shall give written notice to the Chairmen and ranking minority members of the Committees on Appropriations and the Judiciary of the Senate and of the House of Representatives not later than 30 days after the approval of a reward under clause (ii);

(iv) any executive agency or military department (as defined, respectively, in sections 105 and 102 of title 5) may provide the Attorney General with funds for the payment of rewards; and

(v) neither the failure of the Attorney General to authorize a payment nor the amount authorized shall be subject to judicial review.

(M)

(i) At the request of an appropriate law enforcement official of a State or political subdivision, the Attorney General may assist in the investigation of violent acts and shootings occurring in a place of public use and in the investigation of mass killings and attempted mass killings. Any assistance provided under this subparagraph shall be presumed to be within the scope of Federal office or employment.

(i) For purposes of this subparagraph—

(I) the term "mass killings" means 3 or more killings in a single incident; and

(II) the term "place of public use" has the meaning given that term under section 2332f(e)(6) of title 18, United States Code.

**(2) Specific permitted uses.—**

**(A) Aircraft and boats.—**

Funds available to the Attorney General for United States Attorneys, for the Federal Bureau of Investigation, for the United States Marshals Service, for the Bureau of Alcohol, Tobacco, Firearms and Explosives, for the Drug Enforcement Administration, and for the Immigration and Naturalization Service may be used for the purchase, lease, maintenance, and operation of aircraft and boats, for law enforcement purposes.

**(B) Purchase of ammunition and firearms; firearms competitions.—**Funds available to the Attorney General for United States Attorneys, for the Federal Bureau of Investigation, for the United States Marshals Service, for the Bureau of Alcohol, Tobacco, Firearms and Explosives, for the Drug Enforcement Administration, for the Federal Prison System, for the Office of the Inspector General, and for the Immigration and Naturalization Service may be used for—

(i) the purchase of ammunition and firearms; and

(ii) participation in firearms competitions.

**(C) Construction.—**

Funds available to the Attorney General for construction may be used for expenses of planning, designing, acquiring, building, constructing, activating, renovating, converting, expanding, extending, remodeling, equipping, repairing, or maintaining buildings or facilities, including the expenses of acquisition of sites therefor, and all necessary expenses incident or related thereto; but the foregoing shall not be construed to mean that funds generally available for salaries and expenses are not also available for certain incidental or minor construction, activation, remodeling, maintenance, and other related construction costs.

**(3) Fees and expenses of witnesses.—**Funds available to the Attorney General for fees and expenses of witnesses may be used for—

(A) expenses, mileage, compensation, protection, and per diem in lieu of subsistence, of witnesses (including advances of public money) and as authorized by section 1821 or other law, except that no witness may be paid more than 1 attendance fee for any 1 calendar day;

(B) fees and expenses of neutrals in alternative dispute resolution proceedings, where the Department of Justice is a party; and

(C) construction of protected witness safesites.

**(4) Federal bureau of investigation.—**

Funds available to the Attorney General for the Federal Bureau of Investigation for the detection, investigation, and prosecution of crimes against the United States may be used for the conduct of all its authorized activities.

**(5) Immigration and naturalization service.—**Funds available to the Attorney General for the Immigration and Naturalization Service may be used for—

(A) acquisition of land as sites for enforcement fences, and construction incident to such fences;

(B) cash advances to aliens for meals and lodging en route;

(C) refunds of maintenance bills, immigration fines, and other items properly returnable, except deposits of aliens who become public charges and deposits to secure payment of fines and passage money; and

(D) expenses and allowances incurred in tracking lost persons, as required by public exigencies, in aid of State or local law enforcement agencies.

(6) **Federal prison system.—**Funds available to the Attorney General for the Federal Prison System may be used for—

(A) inmate medical services and inmate legal services, within the Federal prison system;

(B) the purchase and exchange of farm products and livestock;

(C) the acquisition of land as provided in section 4010 of title 18; and

(D) the construction of buildings and facilities for penal and correctional institutions (including prison camps), by contract or force account, including the payment of United States prisoners for their work performed in any such construction;

except that no funds may be used to distribute or make available to a prisoner any commercially published information or material that is sexually explicit or features nudity.

**(7) Detention trustee.—**

Funds available to the Attorney General for the Detention Trustee may be used for all the activities of such Trustee in the exercise of all power and functions authorized by law relating to the detention of Federal

prisoners in non-Federal institutions or otherwise in the custody of the United States Marshals Service and to the detention of aliens in the custody of the Immigration and Naturalization Service, including the overseeing of construction of detention facilities or for housing related to such detention, the management of funds appropriated to the Department for the exercise of detention functions, and the direction of the United States Marshals Service and Immigration Service with respect to the exercise of detention policy setting and operations for the Department of Justice.

**(c) Related Provisions.—**

**(1) Limitation of compensation of individuals employed as attorneys.—**

No funds available to the Attorney General may be used to pay compensation for services provided by an individual employed as an attorney (other than an individual employed to provide services as a foreign attorney in special cases) unless such individual is duly licensed and authorized to practice as an attorney under the law of a State, a territory of the United States, or the District of Columbia.

**(2) Reimbursements paid to governmental entities.—**

Funds available to the Attorney General that are paid as reimbursement to a governmental unit of the Department of Justice, to another Federal entity, or to a unit of State or local government, may be used under authorities available to the unit or entity receiving such reimbursement.

**(d) Foreign Reimbursements.—**

Whenever the Department of Justice or any component participates in a cooperative project to improve law enforcement or national security operations or services with a friendly foreign country on a cost-sharing basis, any reimbursements or contributions received from that foreign country to meet its share of the project may be credited to appropriate current appropriations accounts of the Department of Justice or any component. The amount of a reimbursement or contribution credited shall be available only for payment of the share of the project expenses allocated to the participating foreign country.

**(e) Railroad Police Training Fees.—**

The Attorney General is authorized to establish and collect a fee to defray the costs of railroad police officers participating in a Federal Bureau of Investigation law enforcement training program authorized by Public Law 106–110, and to credit such fees to the appropriation account "Federal Bureau

of Investigation, Salaries and Expenses", to be available until expended for salaries and expenses incurred in providing such services.

**(f) Warranty Work.—**

In instances where the Attorney General determines that law enforcement-, security-, or mission-related considerations mitigate against obtaining maintenance or repair services from private sector entities for equipment under warranty, the Attorney General is authorized to seek reimbursement from such entities for warranty work performed at Department of Justice facilities, and to credit any payment made for such work to any appropriation charged therefor.

**28 U.S.C. § 2671**

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

**CAL. CIV. CODE § 1670.9**

(a) A city, county, city and county, or local law enforcement agency that does not, as of January 1, 2018, have a contract with the federal government or any federal agency or a private corporation to house or detain noncitizens for purposes of civil immigration custody, shall not, on and after January 1, 2018, enter into a contract with the federal government or any federal agency or a private corporation, to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody.

(b) A city, county, city and county, or local law enforcement agency that, as of January 1, 2018, has an existing contract with the federal government or any federal agency or a private corporation to detain noncitizens for purposes of civil immigration custody, shall not, on and after January 1, 2018, renew or modify that contract in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody.

(c) Any facility that detains a noncitizen pursuant to a contract with a city, county, city and county, or a local law enforcement agency is subject to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

(d) A city, county, city and county, or public agency shall not, on and after January 1, 2018, approve or sign a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:

(1) Provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution of the conveyance or permit.

(2) Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public.

## Cal. Gov't Code § 7310

(a) A city, county, city and county, or local law enforcement agency that does not, as of June 15, 2017, have a contract with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody, is prohibited from entering into a contract with the federal government or any federal agency, to house or detain in a locked detention facility owned and operated by a local entity, noncitizens for purposes of civil immigration custody.

(b) A city, county, city and county, or local law enforcement agency that, as of June 15, 2017, has an existing contract with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody, shall not renew or modify that contract in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody.

**CAL. PENAL CODE § 5003.1**

(a) On or after January 1, 2020, the department shall not enter into a contract with a private, for-profit prison facility located in or outside of the state to provide housing for state prison inmates.

(b) On or after January 1, 2020, the department shall not renew an existing contract with a private, for-profit prison facility located in or outside of the state to incarcerate state prison inmates.

(c) After January 1, 2028, a state prison inmate or other person under the jurisdiction of the department shall not be incarcerated in a private, for-profit prison facility.

(d) As used in this section, "private, for-profit prison facility" does not include a facility that is privately owned, but is leased and operated by the department.

(e) Notwithstanding subdivisions (a) and (b), the department may renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap.

**CAL. PENAL CODE § 9500**

As used in this title, the following terms have the following meanings:

(a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding.

(b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity.

**CAL. PENAL CODE § 9501**

Except as otherwise provided in this title, a person shall not operate a private detention facility within the state.

**CAL. PENAL CODE § 9502**

Section 9501 shall not apply to any of the following:

(a) Any facility providing rehabilitative, counseling, treatment, mental health, educational, or medical services to a juvenile that is under the jurisdiction of the juvenile court pursuant to Part 1 (commencing with Section 100) of Division 2 of the Welfare and Institutions Code.

(b) Any facility providing evaluation or treatment services to a person who has been detained, or is subject to an order of commitment by a court, pursuant to Section 1026, or pursuant to Division 5 (commencing with Section 5000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code.

(c) Any facility providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

(d) A residential care facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

(e) Any school facility used for the disciplinary detention of a pupil.

(f) Any facility used for the quarantine or isolation of persons for public health reasons pursuant to Division 105 (commencing with Section 120100) of the Health and Safety Code.

(g) Any facility used for the temporary detention of a person detained or arrested by a merchant, private security guard, or other private person pursuant to Section 490.5 or 837.

**CAL. PENAL CODE § 9503**

Section 9501 does not apply to any privately owned property or facility that is leased and operated by the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

**CAL. PENAL CODE § 9505**

Section 9501 does not apply to either of the following:

(a) A private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

(b) A private detention facility contract renewed pursuant to subdivision (e) of Section 5003.1.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 22, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 22, 2020

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiff-Appellant*
*The GEO Group, Inc.*