# No. 20-56172 c/w 20-56304

In The

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**THE GEO GROUP, INC.,**
*Plaintiff-Appellant,*

*v.*

**GAVIN NEWSOM, in his official capacity as Governor of the State of California;
XAVIER BECERRA, in his official capacity as Attorney General of the State of
California,**
*Defendants-Appellees,*

*and*

**STATE OF CALIFORNIA,**
*Defendant.*

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellant,*

*and*

**THE GEO GROUP, INC.,**
*Plaintiff,*

*v.*

**GAVIN NEWSOM, in his official capacity as Governor of
the State of California, et al.,**
*Defendants-Appellees.*

Appeal from the United States District Court for the Southern District of California
Janis L. Sammartino, District Judge • Case Nos. 3:19-cv-02491-JLS-WVG & 3:20-cv-00154-JLS-WVG

# AMICUS BRIEF OF HUMAN IMPACT PARTNERS IN
# SUPPORT OF DEFENDANTS AND APPELLEES

**HORVITZ & LEVY LLP**
JASON R. LITT
REBECCA G. POWELL
GAREN N. BOSTANIAN
ANNA J. GOODMAN
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800

Attorneys for Amicus Curiae
**HUMAN IMPACT PARTNERS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................4

INTEREST OF AMICUS CURIAE.......................................................7

STATEMENT OF COMPLIANCE WITH RULE 29(a)(4)(E)..................7

SUMMARY OF THE ARGUMENT.......................................................8

ARGUMENT.....................................................................................9

I.  California's historic police powers include its power to legislate over matters involving public health and safety. .............9

II.  Assembly Bill 32 is aimed at mitigating the well-documented, abysmal health and safety concerns inherent to those systems....................................................................11

    A.  The confinement conditions in private carceral facilities are measurably worse than those of public prisons, and have been for years, without any signs of improvement.....................................................................11

        1.  The conditions of confinement present severe health and safety concerns. ..........................................11

        2.  Private prison systems consistently fail to keep incarcerated people safe. .............................................13

        3.  Private prison systems consistently fail to protect the health of incarcerated people...............................15

        4.  Private prison systems rely heavily on solitary confinement and, in so doing, severely damage the mental health of incarcerated people without any legitimate penological purpose............................19

        5.  The abysmal conditions in private prison systems have been clear for years, but are not improving........22

B. California's legislative intervention was an appropriate exercise of its police power because the for-profit private prison model inherently incentivizes cost-cutting at the expense of incarcerated people's health and safety. ............................................................28

CONCLUSION ........................................................................33

CERTIFICATE OF COMPLIANCE ......................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altria Grp., Inc. v. Good,*
   555 U.S. 70 (2008) ............................................................... 10

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,*
   520 U.S. 806 (1997) .............................................................. 10

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,*
   471 U.S. 707 (1985) .............................................................. 10

*McClellan v. I-Flow Corp.,*
   776 F.3d 1035 (9th Cir. 2015) ............................................... 10

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019) ................................................. 11

*Wyeth v. Levine,*
   555 U.S. 555 (2009) .............................................................. 10

## Miscellaneous

ACLU, Warehoused and Forgotten: Immigrants Trapped in
   Our Shadow Private Prison System (2014), https://www.
   aclu.org/other/warehoused-and-forgotten-immigrants-
   trapped-our-shadow-private-prison-system ............................. *passim*

James Austin & Garry Coventry, Emerging Issues on
   Privatized Prisons 46 (2001),
   https://www.ncjrs.gov/pdffiles1/bja /181249.pdf ..................... 13, 27, 29

Curtis R. Blakely & Vic W. Bumphus, *Private and Public
   Sector Prisons—A Comparison of Select Characteristics,*
   68 Fed. Prob. 27 (2004) ........................................................ 13, 28, 31

*Conditions at the NWDC: COVID-19 and Health Standards,*
   Univ. Wash.: Ctr. for Hum. Rts. (Dec. 16, 2020), https:
   //jsis.washington.edu/humanrights/2020/12/16/nwdc-covid/ ............. 25

Detention Watch Network, A Toxic Relationship: Private Prisons and U.S. Immigration Detention (2016), https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf .................................... *passim*

Gabriel Eber & Margaret Winter, *Private Prisons Are the Problem, Not the Solution,* ACLU (Apr. 30, 2012), https://www.aclu.org/blog/smart-justice/mass-incarceration/private-prisons-are-problem-not-solution?redirect=blog/prisoners-rights-criminal-law-reform/private-prisons-are-problem-not-solution ........................................................... 18

*Executive Order on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities*, White House (Jan. 26, 2021), https://bit.ly/2MpyL3Z ....... 12

Dina Perrone & Travis C. Pratt, *Comparing the Quality of Confinement and Cost-Effectiveness of Public Versus Private Prisons: What We Know, Why We Do Not Know More, and Where to Go from Here*, 83 Prison J. 301 (2003) ............... 29

Amicia Ramsey, *Behind the Walls at East Mississippi Correctional Facility*, WTOK (Feb. 21, 2017), https://www.wtok.com/content/news/Behind-the-walls-of-the-East-Mississippi-Correctional-Facilty-414427573.html.............. 17

David M. Reutter, *GEO Group Pulls Out of Mississippi Prisons¸* Prison L. News (Nov. 15, 2013), https://www.prisonlegalnews.org/news/2013/nov/15/geo-group-pulls-out-of-mississippi-prisons/ ........................................................................ 17

S. Poverty L. Ctr., Private Prisons: The Wrong Choice for Alabama (2017), https://www.splcenter.org/sites /default/files/com_policybrief_alabama_private_privatization_web.pdf ......... 30

Carl Takei, *The East Mississippi Correctional Facility is 'Hell on Earth'*, ACLU (Mar. 5, 2018), https://www.aclu.org/blog/prisoners-rights/medical-and-mental-health-care/east-mississippi-correctional-facility-hell ................................................. 17

Timothy Williams, *Inside a Private Prison: Blood, Suicide, and Poorly Paid Guards*, N.Y. Times (Apr. 3, 2018), https://www.nytimes.com/2018/04/03/us/mississippi-private-prison-abuse.html ................................................................................. 18

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards 7 (2019), https://www.oig.dhs.gov/sites /default /files/assets/2019-02/OIG-19-18-Jan19.pdf ........... 22, 23, 24, 25, 26, 27

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements (2018), https://www.oig.dhs.gov/sites/default/ files/assets /2018-06/OIG-18-67-Jun18.pdf ................................................ 23, 24

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities 36 (2006), https://www.oig. dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf ...................................... 22

U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons (2016), https://oig.justice.gov/reports/2016/e1606.pdf ........................ 13, 14, 16

U.S. Gov't Accountability Off., GAO-08-6, Cost of Prisons: Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities (2007), http://www.gao.gov/assets/270/267839.pdf ........................................ 30

## INTEREST OF AMICUS CURIAE

Amicus Curiae is Human Impact Partners ("HIP"). HIP is a national nonprofit organization founded in 2006, based in Oakland, California, and dedicated to advancing public health and improving health equity. HIP has extensive experience researching and developing best practices and policies across various public health contexts, including in the immigration enforcement and incarceration contexts. HIP uses innovative research and data to evaluate the effect of policy on public health and empowers public health agencies, organizations, practitioners, and advocates to address the public health and the well-being of individuals and their families and communities.

## STATEMENT OF COMPLIANCE WITH RULE 29(a)(4)(E)

All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person or entity except HIP or its counsel contributed money to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

The district court rejected appellants' attempts to enjoin the enforcement of California Assembly Bill 32 ("AB 32") as it applies to federal Immigration Customs and Enforcement ("ICE") agency facilities on either preemption or intergovernmental immunity grounds. The district court also ruled that the presumption against preemption applies because the health and safety issues implicated by the confinement of people incarcerated or detained in private facilities are primarily a matter of local concern. (ER 31–32.)

The court's apt findings regarding these health and safety concerns are supported by decades of research. While health research has found incarceration of any kind to be harmful, conditions of confinement in private facilities are measurably worse than those in their public counterparts. Individuals who are incarcerated in private facilities are subjected to more violence and suffer from more severe health concerns due to limited access to medical care, poor sanitation, and excessive use of solitary confinement. Existing oversight protocols have failed to hold private prisons accountable for these violations, and fundamental institutional issues inherent to private facilities have

8

allowed these conditions to remain prevalent for decades. Therefore, AB 32 is a necessary legislation that phases out the use of private prisons and detention centers in California in order to protect those detained within the state's borders from the significant health and safety risks these facilities pose.

In passing AB 32, the California Legislature exercised its police power to mitigate these ongoing negative effects to the health and safety of incarcerated people. This Court should thus find that California's interest in addressing the public health risks created by ICE's continued use of privately operated prison facilities strongly favors affirming the district court's dismissal of the preemption and intergovernmental immunity claims and denial of the related preliminary injunction.

## ARGUMENT

### I. California's historic police powers include its power to legislate over matters involving public health and safety.

Appellants argue AB 32 is preempted because it conflicts with federal law. (Appellant GEO Opening Br. 43; Appellant USA Br. 26.) Conflict preemption applies when "compliance with both federal and

state regulations is a physical impossibility" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). The latter is at issue in this case. (*See* Appellant GEO Opening Br. 43; Appellant USA Br. 26.)

In all preemption cases, courts "start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). "The presumption against preemption 'applies with particular force when Congress has legislated in a field traditionally occupied by the States.'" *McClellan*, 776 F.3d at 1039 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). If the presumption applies, appellants then "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (citation omitted). "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough*, 471 U.S. at

719. This Court has held "California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019).

The safety and health of people in private prisons and detention centers within California's borders are put at significant risk by the continued operation of private facilities, including those operated by the GEO Group. It is well-documented that conditions of confinement in private facilities are disgraceful, supporting California's decision to exercise its police powers to regulate and phase out these private facilities.

## II. Assembly Bill 32 is aimed at mitigating the well-documented, abysmal health and safety concerns inherent to those systems.

### A. The confinement conditions in private carceral facilities are measurably worse than those of public prisons, and have been for years, without any signs of improvement.

#### 1. The conditions of confinement present severe health and safety concerns.

The conditions of confinement within private facilities is disturbing. Two decades of reports reveal acutely unsafe and unhealthy

environments for those detained, much worse than those in public facilities, which themselves are neither healthy nor safe. Making matters worse, these conditions have been ongoing for years with little to no sign of improvement. Ultimately, the combination of inadequate oversight by private prison operators and institutional issues has hindered meaningful change in this area and demanded California's intervention by passing AB 32.

Public health literature confirms not only the treacherous conditions faced by detained and incarcerated people, in terms of both the health and safety issues they regularly encounter, but also how private prisons performed even worse than their public counterparts in the same categories. In fact, President Biden recently acknowledged these disparities when he ordered the Department of Justice to end the use of private prison contracts. *Executive Order on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities*, White House (Jan. 26, 2021), https://bit.ly/2MpyL3Z (citing the Department of Justice's Office of Inspector General 2016 report discussed below to note that "privately operated criminal detention facilities do not maintain the same levels of

safety and security for people in the Federal criminal justice system or for correctional staff").

### 2. Private prison systems consistently fail to keep incarcerated people safe.

While all prisons routinely fail to keep their incarcerated populations safe, private prisons have been repeatedly found to be more violent than public prisons. A 2001 study found "a greater number of inmate-on-inmate assaults per 1,000 inmates at private prisons (35.1 percent) than at public facilities (25.4 percent)." James Austin & Garry Coventry, Emerging Issues on Privatized Prisons 46 (2001), https://www.ncjrs.gov/pdffiles1/bja/181249.pdf. Similarly, a 2004 study found the private sector "reported an average of 40 assaults on inmates and 9 assaults on staff per prison," while the public sector "reported 19 assaults on inmates and 10 assaults on staff per prison." Curtis R. Blakely & Vic W. Bumphus, *Private and Public Sector Prisons—A Comparison of Select Characteristics*, 68 Fed. Prob. 27, 29 (2004).

More recent reports confirm the same trends: private prisons "had higher rates of inmate-on-inmate and inmate-on-staff assaults, as well as higher rates of staff uses of force." U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of

Contract Prisons 18 (2016), https://oig.justice.gov/reports/

2016/e1606.pdf. In another report surveying 42 individuals held in

private detention centers, 31% "reported mistreatment and abuse in

various forms, including verbal abuse, employee theft, retaliation,

abusive solitary confinement, and sexual harassment and assault."

Detention Watch Network, A Toxic Relationship: Private Prisons and

U.S. Immigration Detention 3, 5 (2016),

https://www.detentionwatchnetwork.org/sites/default/files/

reports/A%20Toxic%20Relationship_DWN.pdf.

Further, there are significantly higher rates of lockdowns in

private prisons than public ones, reflecting the substandard health and

safety conditions in private facilities.[1] One study of 28 private and BOP

institutions found the private prisons reported 30 partial lockdowns and

71 full lockdowns, compared to zero reported partial lockdowns and 11

full lockdowns in public facilities, over a four-year period. Detention

---

[1]  Lockdowns are used to "ensure the security of the institution, maintain control of the inmate population, and ascertain the concerns of the inmate population. Lockdowns are often a precautionary measure used to maintain control during a period of inmate dissention." U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, *supra*, at 21.

Watch Network, *supra*, at 21. This means these drastic security measures were used *nine times as often* in private facilities than public ones. *Id.* Some lockdowns were the result of violence among the prison population, but others arose from protests among those incarcerated expressing concerns regarding issues such as medical care and movement restrictions. *See id.* at 21–22.

### 3. Private prison systems consistently fail to protect the health of incarcerated people.

Along with living in unsafe facilities, individuals housed in private facilities also regularly encounter severe health risks. They have raised concerns ranging from issues relating to food and sanitation to their inability to access proper medical care. *See generally* Detention Watch Network, *supra*, at 1–2. A common theme among reports is both delays in necessary care and constant understaffing in private facilities. As one study revealed, their investigation left them "gravely concerned about the ability of some [private] prisons to provide timely care in urgent situations." ACLU, Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System 42 (2014), https://www.aclu.org/other/warehoused-and-forgotten-immigrants-trapped-our-shadow-private-prison-system. This study found instances

15

in which a single doctor was tasked with providing health services to over 2,000 people. *Id.* At another facility, even though the BOP specifically noted that its "[l]ack of healthcare has greatly impacted inmate health and well-being," the BOP renewed the facility's contract anyway. *Id.* at 44. Another report recounts a facility where the required full-time physician was not present for eight months. U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, *supra*, at 32–34. The same facility exhibited significant deficiencies in its health services, including "not following up with inmates with positive tuberculosis test results, missing preventive care evaluations and dental exams, and failing to provide some immunizations." *Id.* at 34. Despite these findings, the BOP monitoring checklist for verifying that facilities provided health services (but which fails to examine whether basic care was being provided to incarcerated people) stated compliance in all categories. *Id.* at 32, 34.

But even in facilities with physicians present, the quality and extent of care provided were abysmal. In one study, 76% of the 42 declarations provided by people incarcerated in those facilities voiced

concerns about their medical care. Detention Watch Network, *supra*, at 3. These complaints ranged from basic medical incompetence to extensive delays in being seen by a medical unit. *Id.* Others explained they were "told to drink water to treat various medical conditions, including earaches, knee pain, post-surgery fever and vomiting, and a broken finger." *Id.* Incarcerated people "with chronic diseases such as diabetes and hepatitis complained their treatments were inconsistent." ACLU, *supra*, at 43.

In one private facility (formerly operated by appellant GEO Group) specifically designated to hold mentally ill incarcerated people,[2] four out of five incarcerated people received psychiatric drugs without a

---

[2] While GEO Group claims the company stopped operating the facility because it was "financially underperforming," David M. Reutter, *GEO Group Pulls Out of Mississippi Prisons*, Prison L. News (Nov. 15, 2013), https://www.prisonlegalnews.org/news/2013/nov/15/geo-group-pulls-out-of-mississippi-prisons/, other evidence suggests the state parted ways due to the years of complaints regarding treatment of incarcerated people and prison conditions while the facility was under GEO Group's control, *see, e.g.*, Carl Takei, *The East Mississippi Correctional Facility is 'Hell on Earth'*, ACLU (Mar. 5, 2018), https://www.aclu.org/blog/prisoners-rights/medical-and-mental-health-care/east-mississippi-correctional-facility-hell; Amicia Ramsey, *Behind the Walls at East Mississippi Correctional Facility*, WTOK (Feb. 21, 2017), https://www.wtok.com/content/news/Behind-the-walls-of-the-East-Mississippi-Correctional-Facilty-414427573.html.

psychiatrist present. Timothy Williams, *Inside a Private Prison: Blood, Suicide, and Poorly Paid Guards*, N.Y. Times (Apr. 3, 2018), https://www.nytimes.com/2018/04/03/us/mississippi-private-prison-abuse.html. According to the *New York Times* investigation, the mental health director for the state's Department of Corrections was a marriage and family therapist, and the person appointed to chief medical officer had never even been to the facility. *Id.* After an incarcerated person suffered injuries from being beaten with a pipe, the medical staff "poured distilled water onto his puncture wounds and sent him back to his cell." *Id.* Three days later, the same man required hospitalization from stab wounds and a broken leg. *Id.*; *see also* Gabriel Eber & Margaret Winter, *Private Prisons Are the Problem, Not the Solution,* ACLU (Apr. 30, 2012), https://www.aclu.org/blog/smart-justice/mass-incarceration/private-prisons-are-problem-not-solution?redirect=blog/prisoners-rights-criminal-law-reform/private-prisons-are-problem-not-solution (describing a scene in the same facility, where the prison has been "starving the mentally ill prisoners, denying them basic mental health care, punishing them with solitary

confinement, and exposing them to such systemic abuse and neglect that suicides and suicide attempts are rampant").

### 4. Private prison systems rely heavily on solitary confinement and, in so doing, severely damage the mental health of incarcerated people without any legitimate penological purpose.

Additionally, people incarcerated in private facilities are regularly forced to endure lengthy, unnecessary periods in solitary confinement. What's worse, "not only is isolation used to punish prisoners for minor infractions, but the isolation unit (typically referred to as segregation, the Special Housing Unit, or SHU) is *regularly used for overflow* when the general population dorms are full." ACLU*, supra*, at 28–29 (emphasis added). Some contracts, and specifically those with GEO Group, require 10% of the facility's beds to be SHU isolation units. *Id.* at 30. This quota effectively functions as an arbitrary requirement "for putting prisoners in extreme isolation whenever the prison is filled to capacity," and is nearly *double* the percentage of incarcerated people kept in isolation at public facilities, even though the public facilities generally house people who pose higher security risks. *Id.* at 30–31. Considering that GEO Group's contracts also require facilities to operate at 90% capacity and offer bonus payments for each additional

person incarcerated above the quota, people in these facilities are doomed to isolation units as a result of purposeful overcrowding, completely unrelated to any penal interest. *See id.* at 36.

Isolation entails being confined for 22 to 24 hours each day in a small cell, with no library visits, no participation in programs, and having to "eat, sleep, use the toilet, and sometimes even shower without ever leaving the cell." *Id.* at 28. Many examples illustrated staff sending incarcerated people to SHUs for "arbitrary reasons that appear to lack any appropriate justification," *id.* at 30, or due to "overcrowding and as inappropriate or disproportionate punishment," Detention Watch Network, *supra*, at 5. This use of SHUs violates both the American Bar Association's Standard for the Treatment of Prisoners and the BOP's own guidelines. ACLU, *supra*, at 28–29. However, their use is still prevalent because, as mentioned earlier, the contracts between the BOP and private prisons *incentivize* its use. *See also infra* Part II.C.2.

This practice erodes the health of people incarcerated in private facilities. Long periods of isolation (which, again, are common and purposefully incentivized in private prisons) lead to severe negative health consequences, including "panic attacks, hallucinations, paranoia,

obsessive or suicidal thoughts, and difficulty concentrating and remembering." ACLU, *supra*, at 29. As one report explained, "[w]hen prisoners reported to the ACLU that the SHU is noisy 24 hours a day with the sounds of other men pounding the walls and doors, screaming, shouting, and crying, they were describing the manifestations of deteriorating mental health." *Id.*

These conditions have "driven [prisoners] to protests, hunger strikes, and even riots," but "the changes prisoners seek with these protests—better medical care, more food, less use of extreme isolation as punishment, and cleaner living conditions—rarely come." *Id.* at 26–27. As detailed below, this cycle continues because of the structure of the agreements between the private facilities and the federal government. When private prisons are, for example, responsible for the cost of medical care, this creates "perverse incentives for private prison administrators to limit costs by reducing medical staff and withholding treatment in order to maximize profit." *Id.* at 42.

**5.** **The abysmal conditions in private prison systems have been clear for years, but are not improving.**

The current "multilayered system to manage and oversee detention contracts . . . does not adequately hold detention facility contractors accountable for not meeting performance standards." U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards 7 (2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf. There are systemic—and widely acknowledged—problems specific to private prison culture that further intensify the disparity in treatment of people detained in private and public facilities and highlight California's significant interest in taking action to protect the health and safety of those detained within its borders.

These conditions have persisted over time, demonstrating the significant space "to improve the inspections process and ensure that all non-compliance deficiencies are identified and corrected." U.S. Dep't of Homeland Sec., Off. of Inspector Gen., Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities

36 (2006), https://www.oig.dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf; *see also* U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools, *supra*, at 7; U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements 4 (2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf (noting that many of the same issues identified in the 2006 OIG report persist in 2018).

There are two primary methods for oversight, identification, and correction of deficiencies in ICE's contract detention facilities: (1) "the facilities inspection process," and (2) "the quality assurance tools in the facilities contracts." U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools, *supra,* at 7. But neither ensure the proper treatment of individuals detained at these facilities. *See, e.g.*, *id.*; *see also* U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities, *supra*, at 5, 11 (acknowledging current procedures are "inadequate to promote effective oversight").

One concern is that "[n]either type of inspection ICE uses to examine detention facilities ensures consistent compliance with detention standards or comprehensive correction of identified deficiencies."[3] U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities, *supra*, at 4. Additionally, "ICE does not adequately hold detention facility contractors accountable for not meeting performance standards." U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools*, supra*, at 7. A study of the GEO-run Northwest Detention Center attributed the continuing subpar conditions at these facilities to a combination of (1) "incentives to overlook" failures to preserve ICE contracts; (2) "inaccurate data" on prisoners and their experiences; (3) "flawed responses to complaints" that do not even register or acknowledge their legitimacy–let alone address the problems they raise; and (4) a lack of consequences for failure to meet the

---

[3] The 2018 report identified that there are continuing issues with inconsistency in scope and thoroughness of inspections; failure to follow up on deficiencies or hold facilities accountable for correcting them; and failure to engage with on-site officials to implement changes. U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities, *supra*, at 4.

standards. *Conditions at the NWDC: COVID-19 and Health Standards*, Univ. Wash.: Ctr. for Hum. Rts. (Dec. 16, 2020), https://jsis.washington.edu/humanrights/2020/12/16/nwdc-covid/.

There is also a need for more oversight of private detention facilities. U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools*, supra*, at 7. Quality assurance surveillance plans ("QASP"), intended to be the primary enforcement mechanism for federal standards, have been absent in contracts with detention facilities. *Id.* One study reviewed 106 contracts but only 28 included the QASP, the "only documented instructions for preparing a Discrepancy Report [to record lack of compliance] and recommending financial penalties." *Id.* Without inclusion of a QASP in a contract, there is a serious question of whether a Discrepancy Report or financial consequences can be issued and imposed on a facility. *Id.*

And when ICE does issue a Discrepancy Report, it "do[es] not track [its] use or effectiveness. No office within ICE can provide any data on how many [reports] are issued to facilities and for what reason . . . [and there is] no way of verifying whether any of these deficiencies [are] corrected." *Id.* at 8. ICE also rarely follows its own

established procedures to address the problems it identifies. *Id.* "Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only *two* occasions, despite documenting *thousands* of instances of the facilities' failures to comply with detention standards." *Id.* at 7 (emphasis added). These unpenalized deficiencies included serious violations "that jeopardize the safety and rights of detainees, such as failing to notify ICE about sexual assaults and failing to forward allegations regarding misconduct of facility staff to ICE [Enforcement and Removal Operations ("ERO")]." *Id.* at 8.

On top of failing to impose warranted fines, ICE regularly uses a "waiver" procedure that excuses contract facilities from their violations and allows them to directly "circumvent detention standards." *Id.* at 9 (emphasis and capitalization omitted). Making matters worse, "ICE has no formal policies and procedures to govern the waiver process and has allowed ERO officials without clear authority to grant waivers." *Id.* The result is that contract facilities can be indefinitely exempted from certain detention standards, even when those standards are necessary to protect the health and well-being of those detained. *See id.* Between September 2016 and July 2018, Custody Management approved 96% of

26

waiver requests, including many waivers of safety and security standards. *Id.* at 9–10. Even more alarming, these waivers "generally do not have an end date" and, once approved, are generally not reassessed or reviewed. *Id.* The result is that a "facility's indefinite exemption from certain detention standards raises risks to detainee health and safety." *Id.*

Adding to the problems raised by these waivers, ICE Custody Management is not required to share information with the ICE staff responsible for contract administration. *Id.* at 12. This means staff "cannot determine whether the waiver contradicts contract terms or violates the [Federal Acquisition Regulation] or other procurement requirements" and "undermines their ability to monitor their assigned contracts." *Id.*

The resulting general indifference to prison standards and willingness and ability to look the other way regarding conditions in private prisons has directly contributed to the "squalid and inhumane living conditions in privately run prisons." Austin & Coventry, *supra*, at 17; *see also* Detention Watch Network, *supra*, at 6 ("[C]oncerns of inadequate medical care, mistreatment, and poor sanitation and food

quality are compounded by the absence of meaningful oversight of private detention contractors."). These problems have been documented extensively, and with AB 32, the state is taking action to remedy them.

**B. California's legislative intervention was an appropriate exercise of its police power because the for-profit private prison model inherently incentivizes cost-cutting at the expense of incarcerated people's health and safety.**

These inadequacies in accountability are symptoms of the deeper issues inherent to the private prison system. Even more than their public counterparts, private detention centers tend to approach facility oversight with a "less eligibility" ideology. Blakely & Bumphus, *supra*, at 30. Administrators utilizing a "less eligibility" framework view incarcerated people as holding "reduced citizenship" and "few rights," which, in turn, actually makes the facilities embracing this model even "more dangerous place[s] to be incarcerated." *Id.* at 28, 30.

This choice of framework makes sense given the defining characteristic of these private prisons: they are, first and foremost, *for-profit businesses*, and protecting people's health and offering rehabilitation-oriented service costs more. *Id.* at 27–28 (reflecting that the "less eligibility" framework is more compatible with a for-profit

business framework). "History shows that privately operated prison facilities were plagued by problems associated with the quest for higher earnings. The profit motive produced such abominable conditions and exploitation of the inmates that public agencies were forced to assume responsibility." Austin & Coventry, *supra*, at 17. Indeed, a significant reason that a private prison structure was adopted was to lower costs to the state. *See* Dina Perrone & Travis C. Pratt, *Comparing the Quality of Confinement and Cost-Effectiveness of Public Versus Private Prisons: What We Know, Why We Do Not Know More, and Where to Go from Here*, 83 Prison J. 301, 302 (2003). And while the intended goal of the state was "higher—or at least comparable—level of quality . . . at a cheaper cost," the reality, particularly when coupled with the oversight challenges discussed above, has been lower costs for ICE and other government entities at a staggeringly high cost to the standard of health and safety afforded to those individuals detained. *Id.*

"Throughout the system, we see evidence that these companies seek to maximize their profits by cutting costs at the expense of people's health, safety and well-being; are not accountable and don't experience consequences for even severe deficiencies; exert undue influence over

government officials and immigration policy; and fight tooth and nail to avoid even minimal transparency." Detention Watch Network, *supra*, at 14. As discussed, "[t]he privatization of immigration detention creates perverse *incentives* for incarceration," *id.* (emphasis added), as evidenced by the facility contracts themselves. For instance, the contracts often contain requirements to maintain an "occupancy quota" with supplemental payments for each additional incarcerated person, up to 115% capacity. *See* ACLU, *supra*, at 36. Similarly, under their contracts, private prisons need not keep or share "publicly available records pertaining to costs and conditions" that are required of their public counterparts. S. Poverty L. Ctr., Private Prisons: The Wrong Choice for Alabama 4 (2017), https://www.splcenter.org/sites/default/files/com_policybrief_alabama_private_privatization_web.pdf. "This lack of accountability shields for-profit prisons from scrutiny while, as a U.S. Government Accountability Office report put it, 'key decision makers, including [BOP] managers, [Office of Management and Budget], and Congress, are not positioned to have the information needed to make the most cost-effective investment decisions.'" *Id.* (quoting U.S. Gov't Accountability Off., GAO-08-6, Cost of Prisons:

Bureau of Prisons Needs Better Data to Assess Alternatives for

Acquiring Low and Minimum Security Facilities 7 (2007),

http://www.gao.gov/assets/270/267839.pdf).

This focus on cost efficiency also extends to the correctional

officers employed in private facilities. Across the board, private

correctional officers make thousands of dollars less than their publicly

employed counterparts. *See* Blakely & Bumphus, *supra*, at 29. They

also undergo far less training: "The private sector required correctional

officers to undergo an average 174 hours of pre-service training and 42

hours of annual in-service training. In comparison, the public sector

required correctional officers to undergo an average 232 hours of annual

pre-service training and 42 hours of in-service training." *Id.* So the

officers in the private sector are underpaid and less prepared, making it

no surprise that "[t]he private sector also reported an average

correctional officer turnover rate of 43%" while the "public sector

reported an average correctional officer turnover rate of 15%." *Id.* The

consequences of these disparities are particularly visible within the

"medical staffing decisions these companies make." Detention Watch

Network, *supra*, at 6. There are "frequent and long-term vacancies for

contractually-required positions, creating a dangerous administrative limbo which allows facilities to pass inspection while also saving money on personnel costs." *Id.* (footnote omitted). Not only does this, again, reveal the private sector's emphasis on cost efficiency over care for the health and safety of individuals detained, but it translates to a lowered standard of care that individuals in the facility will receive, as they will be under the care of less trained, shorter-term employees who are less familiar with the individuals and facilities they are serving.

In light of the health and safety risks currently existing in the private prison context, AB 32 was a reasonable and warranted use of California's police power, necessary to protect the health and safety of individuals detained in California.

# CONCLUSION

For the foregoing reasons and the reasons expressed in the brief on the merits, this Court should affirm the district court's dismissal of the claims.

February 16, 2021

**HORVITZ & LEVY LLP**
  JASON R. LITT
  REBECCA G. POWELL
  GAREN N. BOSTANIAN
  ANNA J. GOODMAN


By:        s/Garen N. Bostanian


Attorneys for Amicus Curiae
**HUMAN IMPACT PARTNERS**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-56172 c/w 20-56304

I am the attorney or self-represented party.

**This brief contains** | 4,720 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
   29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
   *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;

   ○ a party or parties are filing a single brief in response to multiple briefs; or

   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |              |.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Garen N. Bostanian | **Date** | Feb 16, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 08**                                                           *Rev. 12/01/2018*