## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE GEO GROUP, INC.,
*Plaintiff-Appellant*,

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

GAVIN NEWSOM, in his official capacity as
Governor of the State of California,
XAVIER BECERRA, in his official capacity as
Attorney General of the State of California,
and
STATE OF CALIFORNIA,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of California
Civ. Case Nos. 3:19-cv-02491 & 3:20-cv-00154 (Honorable Janis L. Sammartino)

## BRIEF OF *AMICI CURIAE* THE NATIONAL IMMIGRANT JUSTICE CENTER, THE AMERICAN CIVIL LIBERTIES UNION (ACLU), THE ACLU OF SOUTHERN CALIFORNIA, THE ACLU OF SAN DIEGO AND IMPERIAL COUNTIES, AND THE ACLU OF NORTHERN CALIFORNIA IN SUPPORT OF DEFENDANTS-APPELLEES

Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

Jordan Wells
Michael Kaufman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

*Additional counsel listed on next page*

Mary Van Houten Harper
NATIONAL IMMIGRANT JUSTICE CENTER
1099 New York Ave. N.W.
Washington, DC 20001
Telephone: (312) 660-1370
Facsimile: (312) 660-1505

Eunice Hyunhye Cho*
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
915 15th St. N.W.
Washington, DC 20005
Telephone: (202) 548-6616
Facsimile: (202) 393-4931

Vasudha Talla
Sean Riordan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Facsimile: (415) 255-8437

Bardis Vakili
Monika Y. Langarica
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

*Not admitted in DC; practice limited to federal courts

Attorneys for *Amici Curiae*

**TABLE OF CONTENTS**

Page(s)

CORPORATE DISCLOSURE STATEMENT ..........................................................x

INTERESTS OF *AMICI CURIAE* ....................................................................1

INTRODUCTION ...........................................................................................3

FACTUAL BACKGROUND..............................................................................5

ARGUMENT .................................................................................................8

I.     The INA Does Not Authorize ICE to Contract Out Its Detention Responsibilities to Private Entities. ..............................................10

     A. 8 U.S.C. § 1231(g) authorizes ICE to lease, purchase, or build "appropriate places of detention"—not to delegate its detention functions to private entities. ..................................................10

     B. 8 U.S.C. § 1103(a)(11) authorizes ICE to contract detention responsibilities only to state and local governments................................15

     C. The "system Congress created" in the INA provides no authorization for ICE to delegate detention authority to private entities. ......................18

II.    No Other Federal Law Supersedes the INA's Regulation of Immigration Detention ........................................................21

     A. The DHS Secretary general authorizing statute, 6 U.S.C. § 112, cannot displace the INA's substantive requirements for immigration detention. ........................................................................21

     B. The Attorney General's authority to contract "with non-Federal parties" contained in 28 U.S.C. § 530C(a)(4) did not transfer to the DHS Secretary in the Homeland Security Act of 2002...........................23

     C. Section 118 of the DOJ Appropriation Act of 2001 did not modify DHS's authority to contract out its detention authority...............25

CONCLUSION...............................................................................................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007)...................................................................11

*Aleman Gonzalez v. Barr*,
955 F.3d 762 (9th Cir. 2020) ...............................................................1

*Arizona v. United States*,
567 U.S. 387 (2012)...................................................................*passim*

*Calloway v. D.C.*,
216 F.3d 1 (D.C. Cir. 2000)................................................................27

*Clark v. Suarez Martinez*,
543 U.S. 371 (2005)..............................................................11, 24

*Comm. of Cent. Am. Refugees v. INS*,
795 F.2d 1434 (9th Cir. 1986). ..........................................................11

*Crawford Fitting Co. v. J. T. Gibbons, Inc.*,
482 U.S. 437 (1987).........................................................................22

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003).........................................................................17

*Esparza v. Nobles County*,
Case No. A18-2011 (Minn. Ct. App.) ................................................3

*Hardie v. NCAA*,
876 F.3d 312 (9th Cir. 2017) .............................................................10

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ...............................................................1

*U.S. ex rel. I.G. Farben v. Burnet*,
65 F.2d 195 (D.C. Cir. 1933)..............................................................24

*I.N.S. v. St. Cyr*,
533 U.S. 289 (2001)...........................................................................10

*Reyna ex rel J.F.G. v. Hott*,
921 F.3d 204 (4th Cir. 2019) ...............................................................11

*Kucana v. Holder*,
558 U.S. 233 (2010).............................................................................11

*Lunn v. Commonwealth*,
78 N.E.3d 1143 (Mass. 2017).........................................................2, 19

*Martinez v. Regents of Univ. of Cal.*,
50 Cal. 4th 1277 (2010)..........................................................................2

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)..............................................................................22

*Morton v. Mancari,*
417 U.S. 535 (1974)..............................................................................22

*Perez-Guzman v. Lynch*,
835 F.3d 1066 (9th Cir. 2016) .............................................................22

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976)..............................................................................22

*Ramon v. Short*,
Case No. DA 18-0661 (Mont. Sup. Ct.) .................................................3

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) .................................................................1

*Roy v. County of Los Angeles*,
Case No. 12-9012 (C.D. Cal.)................................................................2

*Russello v. United States*,
464 U.S. 16 (1983)................................................................................13

*San Francisco v. U.S. Dep't of Transp.*,
796 F.3d 993 (9th Cir. 2015) .........................................................12, 17

*TRW Inc. v. Andrews*,
534 U. S. 19 (2001)...............................................................................13

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ...............................................................2

*United States v. Will*,
449 U.S. 200 (1980) ...........................................................................26

*People ex rel. Wells v. DeMarco*,
168 A.D.3d 31 (N.Y. App. Div. 2018) ...............................................19

*People ex. rel. Wells v. DeMarco*,
Case No. 2017-12806 (N.Y. App. Div.) .............................................2

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ...........................................................................22

*Williams v. Taylor*,
529 U.S. 362 (2000) ...........................................................................22

*Wisconsin Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018) .......................................................................24

*Yates v. United States*,
574 U.S. 528 (2015) ...........................................................................11

*Young v. UPS*,
575 U.S. 206 (2015) ...........................................................................13

**Statutes and Regulations**

8 C.F.R. § 242.2(b) ...........................................................................20

8 C.F.R. § 287.1(g) ...........................................................................18

8 C.F.R. § 287.5(c)(6) ..................................................................18, 20

8 C.F.R. § 287.5(e)(3) ........................................................................20

48 C.F.R. § 3017.204–90 ...................................................................26

6 U.S.C. § 112 .........................................................................21, 22, 24

8 U.S.C. § 1101(a)(18) .......................................................................12

8 U.S.C. § 1103(a) ..............................................................................19

8 U.S.C. § 1103(a)(4) ..........................................................................19

8 U.S.C. § 1103(a)(6) ..........................................................................19

8 U.S.C. § 1103(a)(10) ........................................................................19

8 U.S.C. § 1103(a)(11) ...................................................................*passim*

8 U.S.C. § 1231(g) ..........................................................................*passim*

8 U.S.C. § 1232(i) ...............................................................................20

8 U.S.C. § 1252(c) (1952) ...................................................................13

8 U.S.C. § 1252c ..................................................................................19

8 U.S.C. §§ 1357(g)(1)-(3) ..............................................................19, 20

8 U.S.C. § 1357(g)(5) ..........................................................................20

18 U.S.C. § 4013 ..................................................................................25

18 U.S.C. § 4013(a) ..................................................................4, 8, 16, 17

18 U.S.C. § 4013(a)(3) .........................................................................16

28 U.S.C. § 530C(a)(4) ....................................................................23, 24

41 U.S.C. § 353(d) ...............................................................................26

ALA. CODE § 14-6A-2 ...........................................................................17

ALASKA STAT. ANN. § 33.30.031 ..........................................................17

ARIZ. REV. STAT. ANN. § 41-1609 ........................................................17

ARIZ. REV. STAT. ANN. § 41-1609.01 ....................................................17

ARK. CODE ANN. § 12-50-106 ..............................................................17

COLO. REV. STAT. ANN. § 17-1-201 .......................................................17

CONN. GEN. STAT. ANN. § 18-86b .........................................................17

FLA. STAT. ANN. § 944.105 ...................................................................17

FLA. STAT. ANN. § 944.715 ........................................................................17

GA. CODE ANN. § 42-2-11(i) ......................................................................17

HAW. REV. STAT. ANN. § 353-16.36 ...........................................................17

IDAHO CODE ANN. § 20-805 .......................................................................17

IND. CODE ANN. § 11-8-3-1 ........................................................................17

KY. REV. STAT. ANN. § 197.505 .................................................................17

KY. REV. STAT. ANN. § 197.510 .................................................................17

LA. REV. STAT. ANN. § 15:1171 .................................................................17

MICH. COMP. LAWS ANN. § 791.220j .........................................................17

MINN. STAT. ANN. § 241.021 ......................................................................17

MISS. CODE ANN. §§ 47-4-1, 47-4-3, 47-5-1207, 47-5-1213 .....................17

MONT. CODE ANN. § 53-30-106(3) ..............................................................17

N.C. GEN. STAT. ANN. § 148-37(g) .............................................................17

N.M. STAT. ANN. § 33-1-17 ........................................................................17

NEV. REV. STAT. ANN. § 209.141 ...............................................................17

OHIO REV. CODE ANN. § 9.06 .....................................................................17

OKLA. STAT. ANN. tit. 57, § 41, 57(D) ......................................................17

OKLA. STAT. ANN. tit. 57, § 41, 504(b)(7) ................................................17

S.D. CODE ANN. § 24-11-40 .......................................................................17

TENN. CODE ANN. §§ 41-24-101 to § 41-24-115 .......................................17

TEX. GOV'T CODE ANN. § 495.001 .............................................................17

UTAH CODE ANN. § 64-13-26 .....................................................................17

VA. CODE ANN. § 53.1-71.1 ........................................................................17

W. VA. CODE ANN. § 25-5-6 ....................................................................17

WYO. STAT. ANN. § 7-22-102 ...............................................................17

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 1(a)(4) 114 Stat.
2763, 2763A–179 (2000) [app. D, div. A, ch. 2, § 213(a)(2)]……...…………25

Department of Justice Appropriations Act of 2001, § 1(a)(2) 114 Stat.
2762, 2762A–69 (2000) [app. B, title I, § 119],................................................25

Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135 .................23, 24

Illegal Immigration Reform and Immigrant Responsibility Act of
1996, Pub. L. No. 104–208, Stat. 3009–546 ...................................13, 14, 15, 16

Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163
(1952)...................................................................................................*passim*

Justice Appropriations Authorization Act, Pub. L. 107–273, 116 Stat.
1767 [div. A, title II, § 201(a)]...............................................................24

Pub. L. 100–690, title VII, § 7608(d)(1), 102 Stat. 4181 (1988)...........................16

William Wilberforce Trafficking Victims Protection Reauthorization
Act of 2008, Pub. L. 110–457, tit. II, 122 Stat. 4044 (2008) ............................20

**Other Authorities**

*Constitutional Limits on "Contracting Out" Department of Justice*
*Functions under OMB Circular A-76,*
Op. O.L.C. 94 (Apr. 27, 1990)........................................................................9

*Legality of Fixed- Price Intergovernmental Agreements for Detention*
*Services,*
26 Op. O.L.C. 235 (Dec. 31, 2002) ................................................................26

Douglas C. McDonald, *Public Imprisonment by Private Means - The*
*Re-Emergence of Private Prisons and Jails in the United States,*
*the United Kingdom, and Australia* 34 Brit. J. Criminology 29
(1994)........................................................................................................14

California Department of Justice*, Review of Immigration Detention in California* (Jan. 2021), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2021.pdf..............................................................................6

Department of Homeland Security, Officer of Inspector General, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf ..........................................................................7

Department of Homeland Security, Officer of Inspector General, *Management Alert – Issues Requiring Action at The Adelanto Ice Processing Center In Adelanto, California* (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf ..........................................................................7

Department of Homeland Security, Officer of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018) https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf ..........................................................................6

Department of Homeland Security, Officer of Inspector General, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf ..........................................................................6

ICE, "287(g) Memorandum of Agreement Template," https://www.ice.gov/doclib/detention-reform/pdf/287g_moa.pdf......................20

ICE Guidance on COVID-19, https://www.ice.gov/coronavirus#detStat.............................................................7

National Immigration Justice Center, *Exposing ICE Detention Contracts and Inspections* (Feb. 12, 2021), https://www.immigrantjustice.org/transparency/detention ................................2

Section C Performance Work Statement (Oct. 25, 2019),
https://govtribe.com/file/government-file/70cdcr20r00000002-
california-wide-pws-10252019-final-dot-docx ....................................................5

U.S. Government Accountability Office (GAO-20-596), *ICE Should
Enhance Its Use of Facility Oversight Data and Management of
Detainee Complaints* (Aug. 2020),
https://www.gao.gov/assets/710/708899.pdf........................................................6

U.S. Government Accountability Office, *IMMIGRATION
DETENTION: Actions Needed to Improve Planning,
Documentation, and Oversight of Detention Facility Contracts*
(Feb. 12, 2021), https://www.gao.gov/products/GAO-21-149............................7

**CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1, *Amici* state that they are all separate 501(c)(3) non-profit organizations. No publicly owned corporation holds ten percent or more of the stock of any *amicus*, as none issues any stock.

**INTERESTS OF *AMICI CURIAE*[1]**

The **American Civil Liberties Union (ACLU)** is a nationwide, nonprofit, non-partisan organization dedicated to the principles of liberty and equality enshrined in the U.S. Constitution. The ACLU is deeply involved in protecting the rights of detained immigrants and other imprisoned individuals. The **ACLU of Southern California,** the **ACLU San Diego and Imperial Counties,** and the **ACLU of Northern California** are the California affiliates of the ACLU.

This case raises issues of significant concern to immigrant clients represented by the ACLU and its California affiliates. The ACLU *amici* have litigated numerous cases involving immigration detention. *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) (holding class of individuals detained in facility run by GEO Group stated likely constitutional violation for failure to provide reasonably safe conditions during COVID-19 pandemic); *Aleman Gonzalez v. Barr*, 955 F.3d 762 (9th Cir. 2020) (construing post-removal-order statute to require individualized bond hearings for individuals detained for six months or longer whose removal is not imminent); *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) (holding policy of setting immigration bond amounts without

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amici*, made a monetary contribution to the preparation or submission of the brief. All parties have consented to the filing of this brief.

considering detained persons' financial circumstances likely violated due process). The ACLU *amici* also have participated as *amici* in federal preemption challenges to California laws. *See, e.g., United States v. California*, 921 F.3d 865 (9th Cir. 2019) (substantially upholding denial of preliminary injunction challenge to California laws relating to immigration detention and enforcement); *Martinez v. Regents of Univ. of Cal.*, 50 Cal. 4th 1277, 241 P.3d 855 (2010) (holding federal law did not bar California from offering tuition equality to students).

The **National Immigrant Justice Center (NIJC)** is a Chicago-based non-profit organization that provides free or low-cost legal services to immigrants, including detained noncitizens nationwide. In addition to direct representation, NIJC focuses on transparency and accountability within ICE's sprawling detention system. *See* https://www.immigrantjustice.org/transparency/detention.

NIJC's litigation focuses significantly on ensuring that the law governing immigration enforcement is interpreted in accordance with the statutory system Congress created. NIJC has been party or *amicus* counsel on a host of cases successfully challenging DHS's authority to delegate its civil immigration enforcement authorities to non-federal actors. *See, e.g.*, *Roy v. County of Los Angeles* Case No. 12-9012 (C.D. Cal.) (class counsel with ACLU of Southern California); *Lunn v. Commonwealth*, Docket No. SJC-12276 (Mass.) (party counsel); *People ex. rel. Wells v. DeMarco*, Case No. 2017–12806 (N.Y. App.

Div.) (*amicus*); *Esparza v. Nobles County*, Case No. A18-2011 (Minn. Ct. App.) (*amicus*); *Ramon v. Short*, Case No. DA 18-0661 (Mont. Sup. Ct.) (*amicus*).

**INTRODUCTION**

Plaintiffs-Appellants ("Plaintiffs") The GEO Group, Inc. ("GEO") and the United States argue that AB 32's prohibition against private companies operating detention facilities in California is preempted by federal law and violates the federal government's immunity from state regulation. However, Plaintiffs fail to identify any statute that authorizes Immigration and Customs Enforcement ("ICE") to contract out its detention responsibilities to a private entity. Without such authorization, Plaintiffs' federal supremacy claims necessarily fail.

Congress has not authorized ICE to contract with private prison companies for the detention of immigrants. The text, history, and purpose of the sole provision of the Immigration and Nationality Act ("INA") upon which Plaintiffs rely, 8 U.S.C. § 1231(g), makes this clear. Originally codified elsewhere in the INA at a time when private prisons did not exist, Section 1231(g) permits ICE to <u>lease</u>, <u>purchase</u>, or <u>build</u> "appropriate places of detention"—an authorization undisturbed by AB 32. Congress has authorized ICE to contract out detention responsibilities, but it did so in another provision of the INA that permits ICE to enter into contracts for immigration detention <u>only</u> "with a State or political subdivision of a State." 8 U.S.C. § 1103(a)(11). This limited authority starkly contrasts with a

3

parallel provision authorizing the U.S. Marshals Service to contract out detention responsibilities through "agreements with State or local units of government <u>or contracts with private entities</u>." 18 U.S.C. § 4013(a) (emphasis added).

This limit on ICE's ability to contract out its detention responsibilities is consistent with the INA's provisions carefully prescribing the circumstances under which ICE may delegate civil detention functions to trained state and local officers. *See Arizona v. United States*, 567 U.S. 387, 408-09 (2012). Nowhere does the INA provide similar authority for ICE to delegate detention functions to employees of private prison companies.

Plaintiffs also rely on various statutes outside the INA as sources of ICE's purported authority to contract with private prison companies. These provisions, however, do not apply to immigration detention and cannot supersede the scheme for detention of noncitizens that Congress established in the INA.

It is for Congress—not ICE or GEO—to decide whether to delegate to private entities such an inherently governmental function as civil detention, with its profound impacts on life and liberty. Because Congress has not chosen to do so, AB 32 cannot conflict with federal immigration law or directly regulate or discriminate against lawful activities of the federal government. *Amici* therefore respectfully submit the Court can and should affirm the ruling below on the ground that federal law does not authorize immigration detention by private entities.

4

**FACTUAL BACKGROUND**

Immigration enforcement profoundly implicates relations with foreign governments and "the status, safety, and security of their nationals in the United States." *Arizona*, 567 U.S. at 395. Congress thus has principally entrusted detention functions to trained federal immigration officers and has not provided any authorization for private entities, such as GEO, to carry out immigration detention functions.

Despite this lack of authorization, GEO runs five private immigration detention facilities in California. Under its contracts with ICE, GEO, "and not the Government, is responsible for the day-to-day operation of the Facility and all the management and quality control actions required."[2] Similarly, GEO's staff, and not ICE, is "responsible for the security, care, transportation, and supervision of detainees during all phases of activity in a detention facility."[3]

GEO controls aspects of detention that profoundly impact the life, liberty, and rights of the noncitizens it confines. For example, GEO employees place detained immigrants in disciplinary segregation and mete out other harsh

---

[2] Section C Performance Work Statement (Oct. 25, 2019), *available at* https://govtribe.com/file/government-file/70cdcr20r00000002-california-wide-pws-10252019-final-dot-docx, at 9, incorporated by "Adelanto and Desert View Current ICE Contract" and "Mesa Verde, Central Valley, Golden State Current ICE Contract," Case No. 20-56172, ECF No. 30-2, Add. to Br. of *Amici Curiae* California Collaborative for Immigrant Justice, et al., at 1, 4, 136, 139.

[3] *Id.* at 5 (defining "Detention Officers").

5

punishment; control access to essential healthcare, confidential attorney phone calls, and law library services; conduct random, invasive searches; and determine whether an individual has a "sincerely held belief" warranting a religious diet.[4]

While ICE purports to retain some oversight over its detention contractors, it is well established that ICE does not adequately monitor its contractors, resulting in routine violations of detainees' rights and other serious harms.[5] Nor has ICE implemented or required corrective action based on identified deficiencies or held facilities responsible for correcting them.[6]

Indeed, with respect to GEO's facility at Adelanto, DHS's Office of Inspector General ("OIG") recently issued two damning reports concerning ICE's

---

[4] *See* California Department of Justice, *Review of Immigration Detention in California* (Jan. 2021), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2021.pdf.

[5] *See* U.S. Government Accountability Office (GAO-20-596), *ICE Should Enhance Its Use of Facility Oversight Data and Management of Detainee Complaints* 11 (Aug. 2020), https://www.gao.gov/assets/710/708899.pdf.

[6] *See* Department of Homeland Security, Officer of Inspector General ("OIG"), *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018) at 11-13, https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf; OIG, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), at 7, https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf ("Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only two occasions, despite documenting thousands of instances of the facilities' failures to comply with detention standards.").

lack of supervision, detailing significant violations of detention standards, including restrictive segregation practices.[7] Such concerns underscore the importance of Congress's decision to sharply circumscribe who can exercise the federal government's authority to detain individuals in civil immigration proceedings.

Finally, weighing against the United States' claim of harm to ICE operations is the agency's documented waste in contracting with private prisons: "ICE contracts and agreements have increasingly guaranteed minimum payments to detention facility contractors—paying for beds regardless of use. ICE spent $20.5 million in May 2020 for over 12,000 unused beds a day, on average."[8] As of February 5, 2021, there were 13,860 individuals detained in ICE custody nationwide, representing a tiny fraction of beds currently available to the agency.[9]

---

[7] DHS OIG, *Management Alert – Issues Requiring Action at The Adelanto Ice Processing Center in Adelanto, California* (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf; DHS OIG, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

[8] U.S. Government Accountability Office, *IMMIGRATION DETENTION: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* (Feb. 12, 2021), https://www.gao.gov/products/GAO-21-149 (emphasis added); *see also id.*, Highlights (finding 28 of 40 new contracts for detention from fiscal year 2017 through May 11, 2020 did not have required documentation from ICE demonstrating need for additional space, as required by ICE's process).

[9] *See* ICE Guidance on COVID-19, https://www.ice.gov/coronavirus#detStat.

In light of this, ICE's new contracts with GEO for thousands of additional beds are not only an unauthorized arrogation of power but also a potential boondoggle presented to this Court under the banner of operational necessity.

## ARGUMENT

Plaintiffs' challenge to AB 32 on federal supremacy grounds fails because federal law does not authorize ICE to contract out day-to-day detention responsibilities to a private entity. Plaintiffs cite ICE's authority to determine "appropriate places of detention" under 8 U.S.C. § 1231(g), but that statute plainly affords ICE the discretion to choose among the physical <u>places</u> of detention specified in the statute, not to choose who should <u>perform</u> the agency's detention functions. ICE's authorization for contracting out its detention function appears in a separate provision in the INA enacted contemporaneously with Section 1231(g) that limits such contracting to state and local governments. *See* 8 U.S.C. § 1103(a)(11). Congress therefore elected not to permit the contracting out of immigration detention responsibilities to private entities, unlike in other contexts in which it has expressly so authorized. *See* 18 U.S.C. § 4013(a) (U.S. Marshals may contract out detention responsibilities "pursuant to Federal law under agreements with State or local units of government or contracts with private entities").

Congress, moreover, has authorized state and local officers to be trained to perform immigration detention functions in certain limited circumstances, but no

8

comparable authorization or training exists for private entities or their employees. Given the INA's detailed provisions governing when and how non-federal officers may execute immigration detention functions, it is implausible that Congress would have implicitly authorized ICE to contract out the wholesale operation of detention facilities to private prison companies without any requirements for the conduct or training of the companies' employees.

Plaintiffs search outside of the INA for the authorization for private contracting that the immigration laws lack, but these efforts are in vain. These authorities nowhere permit ICE to contract out its detention responsibilities to private prison companies and, in any event, cannot be read to override the detention scheme that Congress established in the INA.

Federal law therefore plainly does not permit ICE to engage in the private contracting that AB 32 prohibits. Even if there were any ambiguity in these statutes, this Court must construe them to avoid the constitutional concerns presented whenever the government delegates to private entities executive functions that "in any way . . . affect[] the legal rights of third parties." *Constitutional Limits on "Contracting Out" Department of Justice Functions under OMB Circular A-76*, Op. O.L.C. 94, 99 (Apr. 27, 1990). GEO routinely engages in functions profoundly impacting the legal rights of detained immigrants. The Court should not presume Congress intended to delegate these functions

unless its intent is clear. *See Hardie v. NCAA*, 876 F.3d 312, 325-26 (9th Cir. 2017) ("[W]e must employ a 'clear statement' rule when we confront a question of statutory construction that 'invokes the outer limits of Congress' power[.]'") (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 299 (2001)).

## I. The INA Does Not Authorize ICE to Contract Out Its Detention Responsibilities to Private Entities.

### A. 8 U.S.C. § 1231(g) authorizes ICE to lease, purchase, or build "appropriate places of detention"—not to delegate its detention functions to private entities.

Plaintiffs principally cite Section 1231(g) as the source of ICE's authority to contract out detention responsibilities to private entities. However, the text, history, and purpose of Section 1231(g) make clear that it merely authorizes ICE to obtain the necessary facilities for detention. The provision states:

(g) Places of detention

(1) In general

The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service—Salaries and Expenses", without regard to section 6101 of title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

10

(2) Detention facilities of the Immigration and Naturalization Service

> Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

8 U.S.C. § 1231(g).[10]

Plaintiffs insist that Section 1231(g) permits ICE to assign private prison companies the role of conducting ICE's detention functions because the statute authorizes ICE to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g); GEO Br. at 50-51; United States Br. at 9.[11] But this phrase must be read in the context of the provision as a whole. *See, e.g., Yates v. United States*, 574 U.S. 528, 543 (2015) ("[A] word is known by the company it keeps."); *Kucana v. Holder*, 558 U.S. 233, 246 (2010) (interpreting a provision in line with its neighboring provisions). Section 1231(g) goes on to describe the menu of

---

[10] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean "DHS Secretary." *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

[11] GEO also mischaracterizes this Court's holding in *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434 (9th Cir. 1986). GEO Br. at 50-51. That case addressed whether detainees' due process rights were violated when transferred to a different facility. *Id.* at 1435. It is silent on the issues presented here—whether Section 1231(g) authorizes DHS to delegate its detention responsibilities to private entities. *See also Reyna ex rel J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019) (describing Section 1231(g) as "relate[d] more centrally to the government's brick and mortar obligations for obtaining facilities"); *Aguilar v. ICE*, 510 F.3d 1, 20 (1st Cir. 2007) (same).

"appropriate places" from which the agency may choose: facilities the government owns or facilities ICE can purchase, lease, or construct.

Nothing in the text of Section 1231(g) remotely suggests Congress intended the provision to enable ICE to contract out its detention responsibilities to private entities. To the contrary, Section 1231(g) authorizes the expenditure of funds to secure facilities for immigration detention by building, acquiring or leasing them, including, "if not otherwise available," facilities that can function as "living quarters for immigration officers." 8 U.S.C. § 1231(g). The statute ensures living quarters for immigration officers, because they are the "class of employees of the Service or of the United States designated by the Attorney General . . . to perform the functions of an immigration officer specified by this chapter or any section of this title." 8 U.S.C. § 1101(a)(18).

Congress <u>has</u> authorized ICE to contract out its detention functions but did so in a separate provision that only authorizes contracting with state and local governments. *See infra* I.B. (discussing 8 U.S.C. § 1103(a)(11)). That Congress chose to locate this authorization in a separate provision reinforces that Section 1231(g) should only be read to authorize the use of funds to obtain physical places of detention. *See San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 999 (9th Cir. 2015) ("Where Congress includes particular language in one section of a statute but omits it elsewhere, 'it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion.'") (quoting

*Russello v. United States*, 464 U.S. 16, 23 (1983)). Were Plaintiffs' interpretation

of Section 1231(g) correct, Congress would not have needed to enact a separate

statute authorizing ICE to contract with state and local governments. ICE could

simply deem such contracts as "appropriate" and within its purported authority

under Section 1231(g). This Court should reject Plaintiffs' invitation to read

Section 1231(g) in a manner that would essentially render Section 1103(a)(11) a

nullity. *See Young v. UPS*, 575 U.S. 206, 226 (2015) ("We have long held that a

statute ought, upon the whole, to be so construed that, if it can be prevented, no

clause is rendered superfluous, void, or insignificant.") (quoting *TRW Inc. v.

Andrews*, 534 U. S. 19, 31 (2001)) (internal quotations omitted).

*Amici*'s interpretation of Section 1231(g) is supported by the statute's

history and purpose. Section 1231(g) dates from the original INA of 1952 and was

originally codified at 8 U.S.C. § 1252(c) (1952).[12] Immigration and Nationality

Act, Pub. L. No. 82-414, ch. 477, § 242(c), 66 Stat. 163, 210 (1952) (codified at 8

U.S.C. § 1252(c) (1952)). Section 1252(c) (1952) provided:

> The Attorney General is hereby authorized and directed to arrange for
> appropriate places of detention for those aliens whom he shall take
> into custody and detain under this section. Where no Federal buildings

---

[12] This provision was reenacted and moved to its current location at section
1231(g) as part of a reorganization of the statute under the Illegal Immigration
Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104–208,
Div. C, §§ 305 & 306, Stat. 3009–546, 3009–597 to 3009-612.

> are available or buildings adapted or suitably located for the purpose
> are available for rental, the Attorney General is hereby authorized,
> notwithstanding section 3709 of the Revised Statutes, as amended (41
> U. S. C. 5), or section 322 of the Act of June 30,1932, as amended (40
> U. S. C. 278a), to expend, from the appropriation provided for the
> administration and enforcement of the immigration laws, such
> amounts as may be necessary for the acquisition of land and the
> erection, acquisition, maintenance, operation, remodeling, or repair of
> buildings, sheds, and office quarters (including living quarters for
> officers where none are otherwise available), and adjunct facilities,
> necessary for the detention of aliens.

Current Section 1231(g) is substantively identical, except that when Congress reenacted and moved the provision to its current location in 1996, it clarified the clause concerning housing to make clear that it was for the "immigration officers" conducting detention operations at the facility. IIRIRA, Pub. L. No. 104–208, Div. C, § 305, Stat. 3009–546, 3009–606; 8 U.S.C. §1231(g) (emphasis added).

Congress plainly could not have intended that Section 1231(g)'s predecessor would authorize the former INS to contract out its detention functions to private entities. When the INA was enacted in 1952, the statute only contemplated that federal immigration officers could conduct detention functions. *See generally* INA, Pub. L. No. 82-414, 66 Stat. 163 (1952). Indeed, private prison companies did not exist in 1952 or for decades thereafter. *See* Douglas C. McDonald, *Public Imprisonment by Private Means - The Re-Emergence of Private Prisons and Jails in the United States, the United Kingdom, and Australia*, 34 Brit. J. Criminology 29, 30 (1994).

Thus, while Section 1231(g) may authorize ICE to rent or buy facilities from GEO, it does not provide authority for ICE to delegate detention responsibilities to a private for-profit business and its employees.

**B.      8 U.S.C. § 1103(a)(11) authorizes ICE to contract detention responsibilities only to state and local governments.**

Were there any ambiguity about whether Section 1231(g) authorizes contracting with private entities for detention responsibilities, Congress's contemporaneous enactment of a provision authorizing ICE to contract with state and local governments for detention operations makes clear that Congress did not authorize such contracts with private entities. In 1996, when Congress recodified the "Places of Detention" provision described above at Section 1231(g), Congress also enacted 8 U.S.C. § 1103(a)(11), which governs ICE's authority to contract out its detention functions. *See* IIRIRA, Pub. L. No. 104–208, Div. C, § 373, Stat. 3009–546, 3009–647 (codifying current Section 1103(a)(11) at Section 1103(a)(9)). It provides, in pertinent part:

> The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—
>
> (A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law **under an agreement with a State or political subdivision of a State** . . . .

8 U.S.C. § 1103(a)(11) (emphasis added).

Notably, Section 1103(a)(11) expressly authorizes ICE to contract out its detention responsibilities "under an agreement with a State or political subdivision of a State," *id*., but does not authorize such contracts with private entities. And Congress did not change the statutory language in Section 1231(g) to authorize ICE to contract out "guard hire, and the housing, care, and security of persons" to private prison companies. Rather, Congress altered the text of Section 1231(g) to reinforce its intent that <u>immigration officers</u> would operate the facilities contemplated thereunder. *See* IIRIRA, Pub. L. No. 104–208, Div. C, § 305, Stat. 3009–546, 3009–606.

Section 1103(a)(11) also stands in stark contrast with Congress's express authorization for the U.S. Marshals Service to contract with private prison companies. GEO ER 38 (analyzing 18 U.S.C. § 4013(a)(3)). In 1988, Congress enacted the U.S. Marshals Service's various authorities to contract for the detention of people in its custody. Pub. L. 100–690, title VII, § 7608(d)(1), 102 Stat. 4181, 4516 (1988). Congress authorized:

> The Attorney General, in support of United States prisoners in non-federal institutions, is authorized to make payments from funds appropriated for Federal prisoner detention for—(1) necessary clothing, (2) medical care and necessary guard hire, and (3) the housing, care, and security of persons held in custody of a United States Marshal pursuant to Federal law under agreements with State or local units of government **or contracts with private entities**.

18 U.S.C. § 4013(a) (emphasis added).

16

This provision is nearly identical to 8 U.S.C. § 1103(a)(11), with one striking difference. While both statutes authorize the federal government to contract for detention functions pursuant to agreements with state and local governments, Section 4013(a) also authorizes the Marshals to contract with "private entities." Congress's omission of similar authorization for private contracting in Section 1103(a)(11) a mere eight years later should be understood as a deliberate choice. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (inferring congressional intent from absence of language present in related statutes); *San Francisco*, 796 F.3d at 999 (same).[13]

---

[13] Like Congress, state legislatures that have authorized contracts with private prison companies have routinely done so expressly. *See, e.g.,* ALA. CODE § 14-6A-2 (West); ALASKA STAT. ANN. § 33.30.031 (West); ARIZ. REV. STAT. ANN. § 41-1609; ARIZ. REV. STAT. ANN. § 41-1609.01; ARK. CODE ANN. § 12-50-106 (West); COLO. REV. STAT. ANN. §§ 17-1-201 (West); CONN. GEN. STAT. ANN. § 18-86b (West); FLA. STAT. ANN. §§ 944.105, 944.715 (West); GA. CODE ANN. § 42-2-11(i) (West); HAW. REV. STAT. ANN. § 353-16.36 (West); IDAHO CODE ANN. § 20-805 (West); IND. CODE ANN. § 11-8-3-1 (West); KY. REV. STAT. ANN. §§ 197.505, 197.510 (West); LA. REV. STAT. ANN. § 15:1171; MICH. COMP. LAWS ANN. § 791.220j (West); MINN. STAT. ANN. § 241.021 (West); MISS. CODE ANN. §§ 47-4-1, 47-4-3, 47-5-1207, § 47-5-1213 (West); MONT. CODE ANN. § 53-30-106(3) (West); NEV. REV. STAT. ANN. § 209.141 (West); N.M. STAT. ANN. § 33-1-17(West); N.C. GEN. STAT. ANN. § 148-37(g) (West); OHIO REV. CODE ANN. § 9.06 (West); OKLA. STAT. ANN. tit. 57, §§ 41, 57(D), 504(b)(7) (West); S.D. CODIFIED LAWS § 24-11-40; TENN. CODE ANN. §§ 41-24-101 to § 41-24-115 (West); TEX. GOV'T CODE ANN. § 495.001 (West); UTAH CODE ANN. § 64-13-26 (West); VA. CODE ANN. § 53.1-71.1 (West); W. VA. CODE ANN. § 25-5-6 (West); WYO. STAT. ANN. § 7-22-102 (West).

**C. The "system Congress created" in the INA provides no authorization for ICE to delegate detention authority to private entities.**

The Immigration and Nationality Act is the "system Congress created" for the immigration arrest, detention, and removal process. *Arizona v. United States*, 567 U.S. 387, 407-09 (2012). Consistent with Section 1103(a)(11)'s authorization for ICE to contract with states and political subdivisions for "necessary guard hire, and the housing, care, and security of persons" in ICE custody, Congress has explicitly authorized state and local officers to perform immigration arrest and detention functions only in certain limited circumstances and only where they receive specialized training by federal officers. *See* 567 U.S. at 408-09. No comparable authorization or training exists for private entities or their employees.

Congress, through the INA, has delineated in exacting detail who is permitted, and under what circumstances it is appropriate, to arrest and detain immigrants pending removal proceedings. *See id.* at 407-09. The conduct of immigration enforcement has profound implications for relations with foreign governments and their "concern[] about the status, safety, and security of their nationals in the United States." *Id.* at 395. Consequently, Congress devised a system that principally entrusts enforcement and detention functions to specially trained federal immigration officers. *Id.* at 407-08; 8 C.F.R. § 287.1(g) (describing the required immigration training); 8 C.F.R. § 287.5(c)(6) (only authorizing immigration officers that have completed special training to detain noncitizens after arrest).

In 1996—the same year Congress enacted Section 1103(a)(11)—Congress also authorized a number of "limited circumstances in which state officers may perform the [civil arrest and detention] functions of an immigration officer." *Arizona*, 567 U.S. at 408-09; *see* 8 U.S.C. §§ 1103(a); 1357(g); 1252c. In each instance, Congress used explicit language authorizing the delegation of an immigration officer's arrest and detention authorities to state and local officers and required special immigration training when exercising detention for more extensive periods. *See Lunn v. Commonwealth*, 78 N.E.3d 1143, 1159 (Mass. 2017) (observing that "[i]n those limited instances where the [INA] affirmatively grants authority to State and local officers to arrest, it does so in [] explicit terms."); *accord People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 51 (N.Y. App. Div. 2018). In particular, under Section 1357(g)(1), ICE "may enter into a written agreement with a State, or [its] political subdivision" to "carry out [the investigation, apprehension, or detention] function[s]" of an immigration officer (commonly referred to as a "287(g) Agreement").[14] Under a 287(g) Agreement, each immigration enforcement function authorized is expressly identified; each state or local officer must be expressly designated and complete federal

---

[14] Additional authorizations include Section 1252c, authorizing state and local law officers to briefly detain an individual who is a previously deported felon, and Section 1103(a)(10), in the event of a mass influx, ICE "may authorize any State or local law enforcement officer . . . to perform or exercise any of the powers, privileges, or duties [under the INA]." There are also two instances when the DHS Secretary is authorized to delegate immigration authorities to other federal officers. 8 U.S.C. § 1103(a)(4), (a)(6). Those statutory provisions, too, include explicit statutory language that the DHS Secretary is "authorized" to confer on other federal officers "any of the powers, privileges, or duties [under the INA]." *Id.*

immigration training; and those certified state or local officers continue to perform the detention or other functions under the "direction and supervision" of DHS officers. *See* 8 U.S.C. §§ 1357(g)(1), (2), (3), and (5); ICE, "287(g) Memorandum of Agreement Template," https://www.ice.gov/doclib/detention-reform/pdf/287g_moa.pdf (*see* Appendix D, "Standard Operating Procedure," detailing express delegation of each immigration enforcement function, including detention authority under 8 C.F.R. § 287.5(c)(6)).[15]

Conspicuously absent from the INA's careful, detailed roadmap is any authorization to ICE to delegate detention responsibilities to private prison companies. Congress clearly knows how to delegate such duties as evident from its express authorization to state and local officers. Moreover, just over a decade ago, Congress authorized the Secretary for Health and Human Services to contract with "voluntary agencies" (*i.e.*, private social service agencies) "to carry out" the detention of unaccompanied immigrant children. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110–457, tit. II, § 235, 122 Stat. 4044, 5082 (Dec. 23, 2008) (codified at 8 U.S.C. § 1232(i)). Congress, however, has never provided similar authority to ICE to delegate its detention responsibilities to private prison companies and their employees.

---

[15] Likewise, there are strict training requirements for federal immigration officers. *See Arizona*, 567 U.S. at 408 (observing only "federal officers who have received training in the enforcement of immigration law" are authorized to execute civil immigration warrants) (citing 8 C.F.R. §§ 242.2(b), 287.5(e)(3)). *See also* 8 C.F.R. § 287.5(c)(6) (limiting detention function of immigration enforcement to specially-trained federal immigration officers).

Against the backdrop of Congress's detailed provisions governing delegation of detention authority to state and local officers (law enforcement officers who are already independently trained and certified), it is simply implausible that Congress would have implicitly authorized ICE to contract out detention responsibilities to the employees of private prison companies, and done so without <u>any</u> requirements for their conduct or training.

**II.     No Other Federal Law Supersedes the INA's Regulation of Immigration Detention.**

Apart from their misguided reliance on 8 U.S.C. § 1231(g), Plaintiffs also claim that various provisions of federal law outside the INA authorize ICE to contract out its detention responsibilities to private entities. These arguments are meritless. The provisions Plaintiffs invoke do not supersede the INA's framework for immigration detention.

**A.     The DHS Secretary general authorizing statute, 6 U.S.C. § 112, cannot displace the INA's substantive requirements for immigration detention.**

Plaintiffs suggest that the DHS Secretary's generalized authority "to make contracts" as provided by 6 U.S.C. § 112 supersedes the system Congress created for the detention of immigrants in the INA. GEO Br. at 50; United States Br. at 26.

First, Sections 1103(a)(11) and 1231(g)—which specifically govern the detention of immigrants—cannot be superseded by the general contracting authority provided in Section 112. The Supreme Court has repeatedly held that a

"'specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (citing *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153 (1976) (quoting *Morton v. Mancari,* 417 U.S. 535, 550-551 (1974))); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992) ("it is a commonplace of statutory construction that the specific governs the general"); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (holding Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes" ); *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016) ("[A] narrow, precise, and specific statutory provision is not overridden by another provision covering a more generalized spectrum of issues. When two statutes come into conflict, courts assume Congress intended specific provisions to prevail over more general ones.") (citations and quotation marks omitted). This Court should apply this well-established interpretive tool here in light of the INA's detailed scheme for immigration detention.

Second, if Plaintiffs were correct that Section 112 provided the DHS Secretary broad authority to contract out its detention responsibilities without regard to the substantive limits prescribed by the INA, that would render Sections 1103(a)(11) and 1231(g) nullities. *Cf. Williams v. Taylor*, 529 U.S. 362, 404 (2000)

22

("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (internal quotations omitted). This Court should reject Plaintiffs' invitation to read the DHS Secretary's general contracting authority in a manner that would render meaningless the INA's careful regulation of immigration detention.

**B.** **The Attorney General's authority to contract "with non-Federal parties" contained in 28 U.S.C. § 530C(a)(4) did not transfer to the DHS Secretary in the Homeland Security Act of 2002.**

GEO also invokes the Attorney General's authority to contract "with non-Federal parties" under 28 U.S.C. § 530C(a)(4), GEO Br. at 50 n.8, but this argument also fails. The provision authorizes the Attorney General to carry out the "activities of the Department of Justice" "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4). Nothing in the statute purports to confer any authority on the DHS Secretary or ICE, much less any authority to supersede the INA's detailed regulation of immigration detention. To the contrary, the statute plainly specifies that the contracting authority belongs to the "Attorney General," and solely in furtherance of the "activities of the Department of Justice." *Id.*

GEO asserts that the Attorney General's authorities under 28 U.S.C. § 530C(a)(4), including the authority to contract "with non-Federal parties," transferred to the DHS Secretary with the adoption of the Homeland Security Act

of 2002. GEO Br. at 50 n.8. But this is obviously wrong. Following the Homeland Security Act of 2002, many powers within the INA delegated to the "Attorney General" transferred to the DHS Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005). But GEO provides no support for the novel proposition that Attorney General powers that existed outside the INA also transferred with the Homeland Security Act of 2002.

Making GEO's argument even more implausible, Section 530C(a)(4) was enacted a mere 23 days before the Homeland Security Act, which contained a separate statute enabling the newly created DHS Secretary "to make contracts"—6 U.S.C. § 112, discussed above. *Compare* 21st Century Department of Justice Appropriations Authorization Act (Pub. L. 107–273, div. A, title II, § 201(a), 116 Stat. 1767, enacted Nov. 2, 2002), *with* The Homeland Security Act of 2002 (Pub. L. 107–296, 116 Stat. 2135, enacted Nov. 25, 2002). There would have been no need for the authorization in 6 U.S.C. § 112 if Congress had addressed the DHS Secretary's authority days earlier in 28 U.S.C. § 530C(a)(4). Given the absence of any contrary indication, "[s]tatutes enacted at the same session of the legislature should receive a construction, if possible, which will give effect to each." *U.S. ex rel. I.G. Farben v. Burnet*, 65 F.2d 195, 196 (D.C. Cir. 1933); *see also Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (finding strong presumption that Congress intended different purposes for similar statutory

provisions in two different statutes particularly "when the same Congress passed both statutes to handle much the same task.") (internal citation omitted).

### C. Section 118 of the DOJ Appropriation Act of 2001 did not modify DHS's authority to contract out its detention authority.

Finally, GEO relies on a provision buried in the Department of Justice Appropriations Act of 2001 for the proposition that it provides the DHS Secretary the authority to contract out civil detention responsibilities to private actors irrespective of the INA's explicit provisions. GEO Br. at 51 (citing 18 U.S.C. § 4013 note "contracts for Space or Facilities").

Section 118 of the 2001 DOJ Appropriations Act states:

> Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis.

Pub. L. No. 106-553, sec. 1(a)(2) [app. B, title I, § 119], 114 Stat. 2762, 2762A–69 (2000); renumbered § 118, Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 1(a)(4) [app. D, div. A, ch. 2, § 213(a)(2)], 114 Stat. 2763, 2763A–179 (2000). This provision was codified as a note "Contracts for Space or Facilities" at 18 U.S.C. § 4013—the U.S. Marshals' authority to contract for detention service, not anywhere in the INA.

Moreover, Section 118 of the 2001 Appropriation Act was intended to make two modest changes to federal contracting law. The changes are contained in its

two qualifying phrases: "of any reasonable duration" and "on any reasonable

basis." First, "of any reasonable duration" addresses the limitation that DOJ

otherwise could only enter into detention contracts for a maximum duration of five

years, as prescribed by the statutory provision identified: 41 U.S.C. § 353(d).

Second, the phrase "on any reasonable basis" resolved a procurement ambiguity as

to whether DOJ could legally enter into fixed-price detention contracts rather than

contract based on actual costs. This procurement debate, which animated the

enactment of Section 118, is illuminated by a contemporaneous legal opinion of

the Office of the Legal Counsel. *See Legality of Fixed- Price Intergovernmental

Agreements for Detention Services*, 26 Op. O.L.C. 235 (2002).[16]

In short, Section 118 of the DOJ Appropriation Act of 2001 sought to

resolve two arcane procurement issues, not to fundamentally change, *sub silentio*,

explicit provisions of the INA contained in 8 U.S.C. §§ 1231(g) and 1103(a)(11).

*See United States v. Will*, 449 U.S. 200, 221-22 (1980) (finding that changes to

existing laws "by implication are not favored," a principle which "applies with

---

[16] Even assuming that DHS can properly invoke the authority that this appropriations provision provides to DOJ, DHS has interpreted it merely to authorize ICE to "enter into contracts <u>of up to fifteen years' duration</u> for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204–90 (emphasis added). This regulation implements the departure from the otherwise applicable maximum duration of five years. *See* 41 U.S.C. § 353(d). It does not even purport to authorize contracting detention responsibilities out to private entities in contravention of the INA.

special force when the provision advanced . . . was enacted in an appropriations bill."); *Calloway v. D.C.*, 216 F.3d 1, 9 (D.C. Cir. 2000) ("While appropriation acts are 'Acts of Congress' which can substantively change existing law, there is a very strong presumption that they do not.") (citation omitted).

GEO simply reads too much into this appropriation provision. The Court should reject the invitation to look beyond the INA for ICE's authority to contract out its detention functions.

## CONCLUSION

For the foregoing reasons and those contained in the State of California's brief, this Court should affirm the district court's denial of a preliminary injunction.

Dated: February 16, 2021

Jordan Wells
Michael Kaufman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Eunice Hyunhye Cho*
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
915 15th St. N.W.
Washington, DC 20005
Telephone: (202) 548-6616
Facsimile: (202) 393-4931

Respectfully submitted,

*/s/ Mark Fleming*
Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

Mary Van Houten Harper
NATIONAL IMMIGRANT JUSTICE
CENTER
1099 New York Ave. NW
Washington, DC 20001
Telephone: (312) 660-1370
Facsimile: (312) 660-1505

Vasudha Talla
Sean Riordan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Bardis Vakili
Monika Y. Langarica
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

*Not admitted in DC; practice limited
 to federal courts

Attorneys for *Amici Curiae*

28

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 29(a)(5) and Ninth Circuit Rule 32-1, the foregoing Brief of *Amici Curiae* is proportionally spaced, has a typeface of 14 points, and—excluding the parts of the document exempted under Federal Rule of Appellate Procedure 32(f)—contains 6,494 words. This word count was generated using Microsoft Word, the word processor used to prepare the brief.

Dated: February 16, 2021

*/s/ Mark Fleming*
Mark Fleming

# CERTIFICATE OF SERVICE

## *Geo Group, Inc., et al. v. Newsom, et al.*
## Nos. 20-56172 & 20-56304

I, Mark Fleming, hereby certify that I electronically filed the foregoing Brief of *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: February 16, 2021

*/s/ Mark Fleming*
Mark Fleming